**Robert HARDI, M.D., and Robert Hardi, M.D., P.C.,**
**Appellants,**

v.

**Genevieve D. MEZZANOTTE, Appellee.**

**No. 99–CV–1386, 99–CV–1540.**

District of Columbia Court of Appeals.

Argued May 8, 2001.

Decided March 20, 2003.

Lee T. Ellis, Jr., with whom Ralph G. Blasey, III, and Elizabeth A. Scully were on the brief, Washington, DC, for appellants.

Henry M. Lloyd, Washington, DC, with whom William C. Casano was on the brief, for appellee.

Before WAGNER, Chief Judge, and STEADMAN and GLICKMAN, Associate Judges.

WAGNER, Chief Judge:

This appeal arises out of a claim for medical malpractice filed originally by appellee, Genevieve D. Mezzanotte, against appellants, Robert Hardi, M.D., his professional corporation, Robert Hardi, M.D., P.C. (sometimes collectively referred to as Dr. Hardi), and another physician, Dr. Joel

Match. After a bench trial, based upon the record of evidence adduced at an earlier trial, which resulted in a verdict for Dr. Match and a hung jury on appellee's claim against appellants, the trial court entered judgment for appellee and awarded costs. Appellants argue that the trial court erred in: (1) granting summary judgment and striking their statute of limitations defense; (2) finding that proximate cause was established without adequate evidentiary support; (3) including in the damages award medical bills written-off by appellee's health care providers in violation of the collateral source rule; and (4) awarding costs which are not recoverable, including those resulting from the earlier mistrial. We affirm.

## I.

### A. *Factual Background*

According to the evidence, appellee was treated by Dr. John O'Connor in 1990 for diverticulitis, an infectious process affecting the colon. In January and February of 1994, she experienced symptoms which she believed to be a recurrence of that illness. After trying without success to reach Dr. O'Connor, she saw Dr. Hardi, a Board-certified gastroenterologist, on February 3, 1994, and informed him of her suspicions and provided him with a copy of an x-ray report that Dr. O'Connor ordered after he treated her for diverticulitis. The doctor took appellee's history and noted on her chart that Dr. O'Connor had treated her previously with antibiotics for diverticulitis. During his physical examination of appellee, Dr. Hardi felt a mass which he thought to be of gynecological origin. However, he also understood that the mass could be caused by a recurrence of diverticulitis. His medical chart does not show alternate likely causes of appellee's condition or specify diverticulitis as one such cause. Dr. Hardi did not order a CAT–Scan, a test typically ordered when diverti-

culitis may be present, or initiate a course of antibiotic therapy. He informed appellee that her problems were gynecological in nature and referred her to Dr. Joel Match, a gynecologist, for a work-up with respect to the mass.

On February 8, 1994, Dr. Match saw appellee. He ordered a CA–125 blood test, which he testified is 80% reliable in predicting the existence of gynecological cancer. The test was negative for the disease. The report from the ultrasound examination, which Dr. Match ordered, revealed that there was a mass in the left lower quadrant of appellee's abdomen, but it could not be determined whether it was diverticular or gynecological in origin. Therefore, the radiologist recommended a "close clinical and sonographic follow-up." Notwithstanding the results of the tests, Dr. Match concluded that appellee had ovarian cancer and scheduled a complete hysterectomy (the surgical removal of her uterus, fallopian tubes and ovaries) for March 1994. Dr. Match informed Dr. Hardi of the test results. Although the blood test did not reveal cancer, and the ultrasound exam did not reveal an enlarged uterus, Dr. Hardi "cleared" the performance of gynecological surgery. Dr. Match requested that Dr. Hardi undertake further testing within his specialty in order to rule out the possibility that appellee was suffering from any gastrointestinal diseases.

On February 21, 1994, Dr. Hardi performed a sigmoidoscopy on appellee, which entailed the introduction of an endoscope into her sigmoid colon for purposes of observation. He was unable to complete the procedure after multiple attempts because of an apparent obstruction of the colon caused by the diverticulitis. Appellee's expert witness, Dr. Robert Shapiro, explained that such an obstruction is a "red flag," telling the doctor "there is

something wrong with the bowel." Dr. Hardi scheduled a more intrusive procedure, a colonoscopy, performed under general anesthesia, for March 2, 1994. He attempted the procedure multiple times, without success, due to the obstruction, and desisted finally because of "fear of perforation." He ordered Dr. Odenwald, a Sibley Hospital radiologist, to perform a third exploratory procedure, a barium enema of the sigmoid colon, but it could not be completed due to the same obstruction. Dr. Odenwald discussed with Dr. Hardi the possibility that the obstruction resulted from a gastrointestinal disease rather than gynecological cancer.

Immediately following the exploratory procedures on March 2, 1994, appellee's condition deteriorated markedly. These procedures had exerted pressure on her sigmoid colon and caused the spread of her diverticular infection. Appellee was admitted as an emergency patient to Columbia Hospital for Women on March 7, 1994. By then, her diverticular abscess had ruptured, resulting in peritonitis (i.e., infection of the abdomen). Dr. Match ordered a CAT–Scan on March 7, 1994. However, appellee's condition precluded the use of contrast media. Dr. Match also ordered an ultrasound that day, which proved to be non-diagnostic. On March 8, 1994, appellee had surgery which involved removal of her noncancerous reproductive organs. During surgery, multiple infectious abscesses and pus were encountered. Dr. Hafner, the general surgeon who performed the operation, removed the infectious matter from the patient's abdomen, excised the affected portion of her bowel, and performed a colostomy. After surgery, Dr. Hafner informed appellee's husband that she had diverticulitis, not gynecological cancer. Appellee had a slow recovery

due to peritonitis and associated complications, and ultimately, she was required to undergo four additional surgical procedures, involving a "take-down" of her colostomy and the correction of hernias caused by the related weakening of her abdominal wall. These surgical procedures extended into March 1996. Appellee spent a total of eighty-three days as an inpatient at Columbia Hospital for Women and George Washington University Hospital, and a nursing home.

### B. Procedural History

On March 6, 1997, appellee filed suit in Superior Court against appellants and Dr. Match. Appellants and appellee filed cross-motions for summary judgment related to the statute of limitations defense. The trial court (Judge Retchin) denied appellants' motion and granted appellee's motion to strike the statute of limitations defense, concluding that the suit was filed prior to the third anniversary of the March 8, 1994 surgery, the first date on which the court found that the patient could have "known" that she had diverticulitis. The case was tried before a jury which found for Dr. Match on liability. The jury could not reach a verdict in the claim against appellants, thereby necessitating a new trial.

The parties agreed to a bench trial based on the record from the first trial and supplemental briefing. In a Memorandum Opinion, the trial court (Judge Graae) found in favor of appellee and awarded her $909,259.82 in damages, consisting of $209,259.82 in medical bills and $700,000.00 as other damages associated with Dr. Hardi's failure to diagnose and treat her diverticulitis. Subsequently, the court awarded appellee $14,903.92 as taxable costs. Appellants appeal both decisions.[1]

1. Appeal No. 99–CV–1386 relates to the merits, and Appeal No. 99–CV–1540 relates to costs. The appeals were consolidated.

## II.

Appellants argue that the trial court erred in granting appellee's motion for partial summary judgment and striking their statute of limitations defense. They contend that the three-year statute of limitations bars the claim because more than three years before appellee filed her complaint: (1) she knew or could have known the doctor's failure to diagnose and treat her for diverticulitis, and (2) she had her last treatment with him. In response, appellee argues that the trial court, applying the discovery rule, properly concluded that the statute of limitations did not bar the claim. She contends that it was not until March 8, 1994, when it was determined surgically that her illness was a result of diverticulitis and a ruptured diverticular abscess, that she knew or could have known that Dr. Hardi failed to diagnose her condition and treat it as required.

■■■ In this jurisdiction, an action for medical negligence must be filed within three years from the time the right to maintain the action accrues. *See* D.C.Code § 12–301(8) (2002). "Where the fact of an injury can be readily determined, a claim accrues at the time that the plaintiff suffers the alleged injury." *Hendel v. World Plan Executive Council,* 705 A.2d 656, 660 (D.C.1997) (citing *Colbert v. Georgetown Univ.,* 641 A.2d 469, 473 (D.C. 1994) (en banc)). However, where the fact of the alleged tortious conduct and resulting injury are not readily apparent, we apply the discovery rule to determine the date on which the statute of limitations commences to run. *Id.* (citing *Bussineau v. President & Dirs. of Georgetown College,* 518 A.2d 423, 425 (D.C.1986)). Under the discovery rule, "a medical malpractice claim does not accrue until the patient has 'discovered or reasonably should have discovered all of the essential elements of her possible cause of action, i.e., duty, breach, causation and damages.'" *Colbert,* 641

A.2d at 473 (citing *Bussineau,* 518 A.2d at 434) (quoting *Ohler v. Tacoma Gen. Hosp.,* 92 Wash.2d 507, 598 P.2d 1358, 1360 (1979) (en banc) (other citation omitted)). This means that, under the discovery rule, a cause of action accrues for limitation purposes once the plaintiff: (1) has some knowledge of the injury, (2) its cause in fact, and (3) some evidence of wrongdoing on the part of the person responsible. *Morton v. National Med. Enterprises, Inc.,* 725 A.2d 462, 468 (D.C.1999) (citing *Bussineau,* 518 A.2d at 435).

Appellants argue that appellee had actual knowledge of her injury, its cause and evidence of Dr. Hardi's negligence on her first visit to him on February 3, 1994, more than three years before she filed the complaint in this case. The basis for this argument is that appellee went to see Dr. Hardi because she suspected that she was having a recurrence of diverticulitis, informed him of her suspicion and prior history, and knew that he did not treat her that for that condition. It is undisputed that having found a pelvic mass in appellee, Dr. Hardi diagnosed a gynecological condition and referred appellee for treatment to a gynecologist, Dr. Match.

A major flaw in appellants' argument is that they seek to charge appellee with knowledge and an understanding of her medical condition that Dr. Hardi, a specialist in gastrointestinal disorders, did not diagnose even after examining her and the medical records she gave him. Following Dr. Hardi's advice, appellee saw Dr. Match, who in turn informed her that there was a 98% chance that she had ovarian cancer, and after receiving the results of a sonogram, advised her to have a complete hysterectomy. She consulted a third physician, Dr. Meilhauser, who also advised her that her problems were gynecological. Apparently relying on these physicians' opinions, appellee agreed to

have a complete hysterectomy. However, her colon ruptured, and she had to undergo an emergency operation during which it was determined that she had diverticulitis.[2] On these facts, it cannot be said that appellee knew or should have known after her first visit to Dr. Hardi that she had a condition which he failed to diagnose and treat and that she sustained harm as a result of his failure and medical advice.

"[T]he disparity in knowledge between professionals and their clientele generally precludes recipients of professional services from knowing whether the professional's conduct is in fact negligent." *Morrison v. MacNamara*, 407 A.2d 555, 567 (D.C.1979) (citations omitted). The nature of the physician-patient relationship requires the patient to rely on the knowledge and skill of the doctor. At the stage where the physician is providing a diagnosis and advice for the patient's medical care, the patient can not be expected to know that the doctor's actions might be negligent and result in harm or to question them. *See Anderson v. George*, 717 A.2d 876, 878 (D.C.1998) (citation omitted). "[I]t is only when [s]he is acquainted with the problem that in fact exists, by [the physician] or by untoward developments that alert any diligent patient, that his cause of action accrues." *Jones v. Rogers Mem'l Hosp.*, 143 U.S.App. D.C. 51, 442 F.2d 773, 775 (D.C.Cir.1971) (citing *Burke v. Washington Hosp. Ctr.*, 293 F.Supp. 1328 (D.D.C.1968)). In another context involving the applicability of the assumption of the risk defense in a medical malpractice case, we have said that

the superior knowledge of the doctor with his expertise in medical matters and the generally limited ability of the patient to ascertain the existence of certain risks and dangers that inhere in certain medical treatments, negates the critical elements of the defense, *i.e. knowledge* and appreciation of the risk.

*Morrison*, 407 A.2d at 567–68 (emphasis added). Similarly, proof of the injured party's knowledge of some wrongdoing on the part of the physician is required before it can be said that the period of limitations commenced on his or her cause of action for medical malpractice. *See Morton, supra*, 725 A.2d at 468 (citing *Colbert, supra*, 641 A.2d at 473).

Here, appellee could not be expected to know on her initial visit to Dr. Hardi her actual condition or that he failed to diagnose and treat it. Patients who seek medical care are not responsible for diagnosing their own condition, but must rely on the physician's expertise to determine the cause of the problem and provide treatment. *Morrison, supra*, 407 A.2d at 568 (quoting *O'Neil v. State*, 66 Misc.2d 936, 323 N.Y.S.2d 56, 61 (1971)). There is no evidence in the record that appellee had expertise that might cause her to question her physician's medical opinion. Even considered in the light most favorable to appellants, the record shows that appellee was not placed on notice as to her right of action as of the date of her initial visit to Dr. Hardi. Appellants have shown no genuine issue of material fact which would preclude summary judgment on this issue. *See Anderson v. Ford Motor Co.*, 682 A.2d 651, 652 (D.C.1996) (citations omitted) (Summary judgment is appropriate if the record on file shows that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law).

Dr. Hardi argues that any alleged misdiagnosis could have occurred only up to March 2, 1994, the date of appellee's last pre-surgical treatment with him. There-

---

**2.** The post-operative diagnosis is described as "probable tubo-ovarian abscess and diverticu-

lar abscess secondary to ruptured diverticular disease."

fore, he contends, the suit is time barred because this date is also more than three years before the suit was filed on March 6, 1997. However, the record is devoid of evidence that appellee knew or should have known before the date of her emergency surgery, on March 8, 1994, that diverticulitis and the adverse consequences she experienced were related to some failure on the part of Dr. Hardi. Only after the surgery did any physician inform appellee of the nature of her condition and that the pre-operative procedures performed by Dr. Hardi were contra-indicated. The circumstances show that the wrong was not readily ascertainable before March 8th. Under the discovery rule, the cause of action does not accrue until the plaintiff knows or by the exercise of reasonable diligence should know of the injury, its cause in fact and some evidence of wrongdoing. *Morton, supra,* 725 A.2d at 468 (citation omitted). We agree with the trial court that, on the record presented, the time when appellee can be charged with such knowledge occurred on or after March 8th. Therefore, the trial court properly granted partial summary judgment in her favor on this issue.

### III.

Appellants argue that the trial court's finding of proximate cause lacks evidentiary support. They contend that: (1) the trial court did not find, to a reasonable degree of medical certainty, that Dr. Hardi's actions were the proximate cause of appellee's injuries; and (2) the evidence was insufficient to establish that his failure to diagnose diverticulitis and prescribe antibiotics caused appellee to have to undergo surgery. Appellants argue that the evidence shows that surgery was medically necessary to remove the mass and that the antibiotic (amoxicillin) prescribed by Dr. Match did not resolve the mass. Appellee contends that the trial court's finding of proximate causation is supported by the

record. She contends that the trial court properly found, based upon the evidence, that Dr. Hardi's failure to place diverticulitis at the top of the list proximately resulted in his failure to test properly and promptly and provide treatment which would have resolved the infection and avoided the emergency surgery.

 "To establish proximate cause, the plaintiff must present evidence from which a reasonable juror could find that there was a direct and substantial causal relationship between the defendant's breach of the standard of care and the plaintiff's injuries *and* that the injuries were foreseeable." *Psychiatric Inst. of Wash. v. Allen,* 509 A.2d 619, 624 (D.C. 1986) (emphasis in original) (citing *District of Columbia v. Freeman,* 477 A.2d 713, 716 (D.C.1984); *Lacy v. District of Columbia,* 424 A.2d 317, 320 (D.C.1980)). When the trial court's findings of fact lack evidentiary support, this Court must set aside the ruling. *See Byrd v. United States,* 614 A.2d 25, 30 (D.C.1992).

The trial court found that there was "little doubt that prompt treatment with antibiotics (intravenously, if necessary) would likely have resolved the infection, thereby obviating the necessity for surgery." This factual finding is supported by the record. Dr. Robert Shapiro, a gastroenterologist, testified that if appropriate antibiotics had been administered, the patient would likely have avoided the March 8, 1994 surgery. He further testified, and the trial court found, that the immediate and direct cause of the "emergency surgery" on March 8th was Dr. Hardi's exploratory procedures several days earlier, which ruptured her diverticular abscess and caused life-threatening peritonitis. According to the evidence, these procedures were contra-indicated, given the patient's condition. There was evidence that the rupture of her diverticular abscess cre-

ated the necessity for emergency surgery and subsequent medical problems and hospitalizations. Dr. Shapiro testified that appropriate antibiotic therapy should have been started within twenty-four to forty-eight hours of the patient's first visit to Dr. Hardi, and that the sooner started, the better the patient does. He testified that it was his opinion that "more likely than not, if appropriate antibiotics had been administered appellee would have avoided [the March 8th] surgery."

 Appellants argue that the trial court observed that whether appellee ultimately would have required surgery was an "open question." A closer reading of the court's Memorandum Opinion, however, shows that the trial court found that there was an "open question" about the "possibility" of an *elective* surgery to address appellee's diverticulitis at some unspecified time in the future. According to Dr. Shapiro's testimony, it was only a possibility that "one might at some time in the future have recommended surgery to prevent further attacks of diverticulitis, but that would be *elective* surgery." (Emphasis added.) [3]

## IV.

Appellants contend that the trial court included in its award of damages an allocation of $209,259.82 for medical bills of which $107,560.05 has been written-off by appellee's health care providers, and therefore, never paid by her. He argues that the amounts written-off should not be included as damages. Appellee argues that the collateral source rule prohibits the re-

duction of damages by the amounts written-off and that the issue is not preserved for appeal.

### A. Preservation of the Damages Issue for Appeal

Taking first appellee's procedural challenge, we conclude that the issue is preserved. In support of her position, appellee argues that evidence of the amount of any write-offs was never presented. To address this argument, we review briefly the procedural background of the issue. This appeal is from a bench trial based on the record of the prior jury trial. At the first trial, the parties agreed that the issue concerning medical expense write-offs would be preserved for post-trial consideration. The full amount of the medical expenses were submitted to the jury. It was intended that the jury would separate out the amount awarded in a verdict form. The trial court was to determine as a matter of law whether the write-off amounts could be included in the damages award, and if not, the amount of any write-off was to be determined and deducted from the verdict. Although counsel for Dr. Match made a proffer that the written-off amount was $107,560.05, the parties agreed, with the approval of the court, that the amount of any write-offs would be subject to proof in post-trial proceedings. However, the jury verdict went in favor of Dr. Match, and the jury could not reach a verdict with respect to Dr. Hardi. Therefore, there were no post-trial proceedings on this issue.

---

**3.** Appellants argue that there was evidence from the CAT–Scan results which was contrary to the opinion of appellee's medical expert. He also contends that his medical expert agreed with Dr. Match that surgery was medically necessary, given the presence of the mass. Inconsistencies are properly for resolution by the finder of fact. *Hubbard v. Chidel,* 790 A.2d 558, 568 n. 9 (D.C.2002) (citing

*Peterson v. United States,* 657 A.2d 756, 760 (D.C.1995); *Streater v. United States,* 478 A.2d 1055, 1058 n. 4 (D.C.1984)). That the trial court accepted the testimony of appellee's experts over that of Dr. Hardi is within its province as factfinder in a bench trial. *Id.* We find no basis to disturb its factual findings.

By agreement, the second trial was based upon the evidentiary record from the first trial, the parties' briefs, and oral arguments. Prior to the date scheduled for oral argument, appellants submitted proposed findings of fact and conclusions of law which included the argument that appellee was entitled to only medical expenses actually paid ($101,699.77) and not to amounts written-off and never paid ($107,560.05). Appellee filed a response, arguing points of law supporting her position that the full amount was recoverable. The trial court ruled on the issue in its written opinion, concluding that the collateral source rule applied, and therefore, appellee was entitled to any discounts her carrier negotiated. In light of the trial court's ruling, it had no reason to consider the actual amount of the write-offs or to provide Dr. Hardi with the opportunity to present evidence to challenge the amount of recoverable medical expenses, as previously requested. This record shows that the damages question raised by appellants was preserved for review on appeal.

## B. *Collateral Source Issue*

Whether unpaid and "written-off" medical expenses can be recovered by a plaintiff as compensatory damages is an issue of first impression in the District of Columbia. In support of their argument in the trial court, appellants rely here, as they did in the trial court, primarily upon two cases applying Virginia law, *State Farm Mut. Auto. Ins. Co. v. Bowers,* 255 Va. 581, 500 S.E.2d 212 (Va.1998) and *McAmis v. Wallace,* 980 F.Supp. 181, 185 (W.D.Va.1997). *Bowers* involved a suit by an automobile insurance carrier against its insured for overpayments under a medical payments provision. 255 Va. at 583–84, 500 S.E.2d at 212–13. Bowers' policy provided for payment of reasonable and necessary expenses incurred. *Id.* at 583, 500 S.E.2d at 212. The Supreme Court of Virginia, interpreting the language of the policy under the case law of Virginia, concluded that the term "incurred" referred to those amounts that the health care providers accepted as full payment for their services, and not amounts written-off by the providers. *Id.* at 585–86, 500 S.E.2d at 214. In *McAmis,* a federal court held that the collateral source rule does not permit a plaintiff to recover medical expenses written-off by her health care providers pursuant to a contract with Medicaid, since she did not incur the written-off amounts. 980 F.Supp. at 185–86. The court reasoned that under Virginia law before the collateral source rule applies, the injured party must "establish personal liability, at some time, for that amount." *Id.* at 185. Compensatory damages are intended to make a plaintiff whole under Virginia law, and for that to occur, "[p]laintiff, need only receive the actual costs of medical care borne by Medicaid." *Id.* at 185. In *McAmis,* the court also rejected plaintiff's argument that she was entitled to recover the write-off as a benefit of paying taxes into the Medicaid system. *Id.* In making this ruling, the court recognized that Medicaid benefits do not derive from contract, but are dispersed under a social benefits program. *Id.*

Subsequently, the Virginia Supreme Court, distinguishing its earlier holding in *Bowers, supra,* held that the full amount of reasonable medical expenses may be recovered from a tortfeasor without reduction for amounts written-off by health care providers. *See Acuar v. Letourneau,* 260 Va. 180, 531 S.E.2d 316, 321, 323 (Va.2000). In *Acuar,* the appellant, who admitted liability, sought to exclude from damages medical bills written-off by the injured party's health care providers. *Id.* at 317. The court held that the collateral source rule applied and that the amount of damages could not be reduced. *Id.* at 322–23. The court reasoned that:

the focal point of the collateral source rule is not whether an injured party has "incurred" certain medical expenses. Rather, it is whether a tort victim has received benefits from a collateral source that cannot be used to reduce the amount of damages owed by a tortfeasor....

Those amounts written off are as much of a benefit for which [the injured party] paid consideration as are the actual cash payments made by his health insurance carrier to the health care providers. The portions of medical expenses that health care providers write off constitute "compensation or indemnity received by a tort victim from a source collateral to the tortfeasor."

*Id.* at 322 (quoting *Schickling v. Aspinall,* 235 Va. 472, 474, 369 S.E.2d 172, 174 (1988)). The court distinguished *Bowers, supra,* as a case in which it construed the specific terms of an insurance contract and where "neither the tort policy of this Commonwealth nor the collateral source rule was implicated." *Id.* at 321.

In the case now before the court, the tort policy of the District of Columbia and the collateral source rule are implicated. The trial court was persuaded that the collateral source rule applies, and where the party pays the premium for insurance, she is entitled to the benefit of the bargain contracted for including any reduction in payments that the insurance carrier was able to negotiate. We agree. In reaching this decision, we are persuaded by our own longstanding collateral source doctrine and the sound reasoning of the Virginia Supreme Court in *Acuar.*

Under the collateral source rule, payments to the injured party from a collateral source are not allowed to diminish damages recoverable from the wrongdoer. *District of Columbia v. Jackson,* 451 A.2d 867, 870 (D.C.1982) (citing *Hudson v. Lazarus,* 95 U.S.App. D.C. 16, 18, 217 F.2d 344, 346 (1954) (citation omitted)); *Reid v. District of Columbia,* 391 A.2d 776, 778 (D.C.1978). The rule is applicable when either: (1) a payment to the injured party came from a source wholly independent of the tortfeasor, or (2) " 'when the plaintiff may be said to have contracted for the prospect of a double recovery.' " *Jackson,* 451 A.2d at 873 (quoting *Overton v. United States,* 619 F.2d 1299, 1307 (8th Cir.1980)). A reason for the rule is that a party should receive the benefit of a bargain for which he or she has contracted. *Jackson,* 451 A.2d at 871–73.

This case is one in which the payments qualify as a collateral source under both of the above-mentioned criteria.[4] Appellee paid a private carrier to insure her for medical expenses. That contractual arrangement was totally independent of Dr. Hardi. Appellee contracted for them independently of Dr. Hardi, and therefore, Dr. Hardi is not entitled to a credit for those write-offs. *See Jackson, supra,* 451 A.2d at 872. These amounts are a benefit of appellee's agreement with her health insurance carrier, and constitute a collateral source to the tortfeasor. *Acuar, supra,* 531 S.E.2d at 322–23 (citation omitted).

Dr. Hardi concedes that appellee is entitled to recover amounts actually paid by her or her insurance carrier, but argues that she should not be able to recover

4. We take this appeal as it comes to us. Appellants do not challenge the reasonableness of the full fees set forth in the medical bills and claimed by the appellee, nor do appellants attempt to establish that the "discounted" or "written-off" amounts actually paid to the medical providers constituted in themselves reasonable fees. No record is made as to the basis on which the discounted fees were determined nor the details of the arrangements with the medical providers. Therefore, we leave for another day what the outcome could be in such circumstances.

amounts not paid by anyone (*i.e.*, written-off amounts). In support of its argument, Dr. Hardi cites *Reid, supra,* 391 A.2d at 777 and *Moorhead v. Crozer Chester Med. Ctr.,* 564 Pa. 156, 765 A.2d 786 (2001). *Reid,* as amended, does not address the issue now before us. *See Reid,* 391 A.2d at 777–81, as amended in *Reid v. District of Columbia,* 399 A.2d 1293 (D.C.1978). Regardless of any broad language in the opinion in *Moorhead,* that case involved medical services provided by the tortfeasor itself so that an application of the collateral source rule would have required, in effect, double payment. *See* 765 A.2d at 788. In *Moorhead,* the plaintiff sued the medical facility which had treated her for her injuries. *Id.* at 787. The medical facility was a voluntary participant in the Medicare program and had a contractual obligation under it to accept a limited amount for its services. *Id.* at 788, 790. The court held that "[g]iven [the medical facility's] contractual obligations, the trial court did not err in determining that [plaintiff] was limited to recovering ... the amount that was paid and accepted as payment in full for past medical expenses." *Id.* at 790. *Moorhead* is not persuasive because there, it was the tortfeasor who provided medical services at a reduced cost pursuant to its own contract, as opposed to plaintiff's. Since the court allowed plaintiff's damages for the amount actually paid to the medical facility, and the facility itself provided services in the greater amount, it is fair to say that the medical facility actually made plaintiff whole for the full amount of the claimed medical expenses. It was the tortfeasor's contract that accounted for this result, not the plaintiff's, as far as we can tell.[5]

■ Here, a private insurance carrier paid appellee's medical expenses. That source is wholly independent of appellants. Because any write-offs conferred would have been a byproduct of the insurance contract secured by appellee, even those amounts should be counted as damages. *See Jackson, supra* note 5, 451 A.2d at 871–73. Therefore, because any write-offs enjoyed by appellee were negotiated by her private insurance company, a source independent of appellants, they should be included in her damages. Under the collateral source rule, she is entitled to all benefits resulting from her contract.

## IV.

Appellants argue that the trial court awarded costs to appellee which are not recoverable. Specifically, they contend that the costs related to the earlier mistrial are not taxable against them in the second trial. Alternatively, they challenge specific costs, including certain witness fees, deposition transcripts, copying costs, and medical records. Appellee responds that some of appellants' arguments are moot, as the trial court reduced the amount she requested originally, excluding some of their requested costs. Further, she contends that costs associated with the first trial were awarded properly, as the second trial was based upon the testimony and exhibits from the first.

■ Pursuant to Super. Ct. Civ. R. 54(d), costs may be awarded to the prevailing party. *Harris v. Sears Roebuck & Co.,* 695 A.2d 108, 109 (D.C.1997) (citing Super. Ct. Civ. R. 54(d)(1)) (other citations omitted). The rule provides that "costs other than attorneys' fees shall be

---

**5.** It is worth noting again here that in this jurisdiction, the collateral source rule is applicable when payment comes from a source wholly independent of the tortfeasor or when *plaintiff* "contract[s] for the prospect of double recovery." *District of Columbia v. Jackson,* 451 A.2d 867, 873 (1982). It does not appear that the facts in *Moorhead* would meet these tests. Our review of the record in this case suggests that the standard is met here.

allowed as of course to the prevailing party unless the Court otherwise directs . . . ." Super. Ct. Civ. R. 54(d)(1). "The authority of a court to assess a particular item as costs is partly a matter of statute (or court rule), and partly a matter of custom, practice, and usage." *Robinson v. Howard Univ.*, 455 A.2d 1363, 1368–69 (D.C.1983) (citing *Newton v. Consolidated Gas Co.*, 265 U.S. 78, 44 S.Ct. 481, 68 L.Ed. 909 (1924) (annotation and other citation omitted)). Under Super. Ct. Civ. R. 54–I(b), the costs of depositions and transcripts may be taxed as costs, in the trial court's discretion. Witness fees are recoverable as costs upon compliance with certain technical requirements of Super. Ct. Civ. R. 54–I(a). Whether to award costs is committed to the trial court's discretion, and, upon review, it is not for the appellate court to substitute its discretion for that of the trial court. *Harris*, 695 A.2d at 110; *Robinson*, 455 A.2d at 1369 (citations omitted). With these general principles in mind, we consider the trial court's order awarding costs and appellants' challenges to it.

The trial court awarded costs to appellee in the amount of $14,903.92.[6] Appellants contend that there was included improperly in this amount costs incurred in the first jury trial associated with the claim against Dr. Match and the mistrial. They contend that it was error to award these costs because appellee was not the prevailing party on either claim in the first trial. Further, they contend that the only costs necessary for the retrial of appellee's claims were for trial transcripts, which totaled $1,773.00.

In support of their argument that costs related to the mistrial are not taxable, appellants cite *United States v. Deas*, 413 F.2d 1371 (5th Cir.1969). *Deas* concerned whether costs of a mistrial could be taxed under a federal statute, 28 U.S.C.A. § 1918(b), to a criminal defendant convicted in a subsequent trial. *Id.* at 1372–73. The statute permitted an assessment of costs upon conviction.[7] The court held that where the previous mistrial was "due solely to the jury's failure to agree upon a verdict," separate court costs were not encompassed within the provisions of the statute. *Id.* In reaching this conclusion, the court considered that: (1) levying such costs upon a criminal defendant "is a deprivation of property that may be imposed only in accordance with reasonable and narrowly defined standards;" (2) it would have the effect of penalizing a defendant for the government's failure of proof in the first case; and (3) it might have a deterrent effect on the right of the accused to plead not guilty and go to trial the second time. *Id.* at 1372. No similar statute or considerations are present here.

Moreover, in this case, there was no new presentation of the evidence, since the parties agreed to a second trial by the court based on the record of the testimony and evidence adduced at the first trial. Thus, the costs incurred for the first trial essentially were used to produce the evidence used again in the second

---

**6.** Appellee requested $15,982.87 as costs. In response to appellants' opposition, she conceded to the elimination of $943.95 ($18.80 for untimely copying costs and deposition costs for Dr. Borow ($480.40) and Dr. Bergin ($444.75)). Appellee contends that the remaining amount not approved by the trial court, $135.00, was for witness fees paid to doctors who appeared at depositions pursuant to subpoenas. Appellee argued before the trial court that such costs are a matter for the trial court's discretion, since not authorized by statute.

**7.** The statute, 28 U.S.C.A. § 1918(b), provided: "Whenever any conviction for any offense not capital is obtained in a district court, the court may order that the defendant pay the costs of prosecution." *See Deas*, 413 F.2d at 1372 n. 2.

trial. Appellee had not previously recovered the costs of the presentation upon which she later prevailed. Under these circumstances, the trial court could properly exercise its discretion to award these costs, which were necessary for the presentation of appellee's case.[8] "An appellant contesting an award of costs 'bears the burden of convincing this court on appeal that the trial court erred .... [and] the burden is even greater when the standard of review is abuse of discretion. "' *Talley v. Varma,* 689 A.2d 547, 555 (D.C.1997) (quoting *Robinson, supra,* 455 A.2d at 1370). Appellants filed in the trial court an opposition in response to appellee's bill of costs in which it attempted to meet this burden, and appellee filed a reply. With all this information before it, the trial court, with a full knowledge of the issues and arguments, rejected appellants' argument that the costs it awarded were not necessary to the presentation of appellee's medical malpractice action. Having reviewed the record related to the costs awarded, we conclude that appellants have failed to demonstrate that the trial court abused its discretion in this regard.

For the foregoing reasons, the judgement of the trial court hereby is

*Affirmed.*

8. Appellants did not show that any of the costs awarded to appellee were solely related to the claim against Dr. Match. This is a case in which Dr. Hardi referred appellee to Dr. Match and consulted with him about her care, and appellee sued both of them jointly and severally. We find no basis to overturn the trial court's decision in this regard.