DICKSON, Justice,
dissenting.
The majority holds that defendants in personal injury cases may introduce evidence of reduced amounts actually paid and accepted to satisfy accounts for medical services under arrangements between a plaintiff's insurer and the medical service providers "[tlo the extent the discounted amounts may be introduced without referencing insurance." I believe this new rule contravenes the express requirements of the collateral source statute, Ind.Code § 34-44-1-2, and is also unfair and undesirable judicial policy.
Although only four thousand or so dollars is actually at stake in this appeal, the majority's decision impacts more than just the calculation of medical expense damages that an injured plaintiff is entitled to receive from a defendant whose wrongful acts caused the injury. The amount of reasonable medical expenses incurred by a plaintiff is an important factor that influences juries in their assessment of additional general damages. As a plaintiff's medical expenses increase or decrease, a *861 corresponding effect on the award of general damages is often observed.[1] It is thus not surprising that the amici curiae Defense Trial Counsel of Indiana and Indiana Trial Lawyers Association are strongly asserting opposing views.
The Collateral Source Statute
The new rule established today, in my opinion, contravenes the express provi-gions of the collateral source statute, which should control this case. The collateral source statute states:
Sec. 2. In a personal injury or wrongful death action, the court shall allow the admission into evidence of:
(1) proof of collateral source payments other than:
(A) payments of life insurance or other death benefits;
(B) insurance benefits for which the plaintiff or members of the plaintiff's family have paid for directly; or
(C) payments made by:
(i) the state or the United States; or
(1) any agency, instrumentality, or subdivision of the state or the United States;
that have been made before trial to a plaintiff as compensation for the loss or injury for which the action is brought;
(2) proof of the amount of money that the plaintiff is required to repay, including worker's compensation benefits, as a result of the collateral benefits received; and
(8) proof of the cost to the plaintiff or to members of the plaintiff's family of collateral benefits received by the plaintiff or the plaintiff's family.
Ind.Code § 34-44-1-2 (emphasis added). Creating an exclusion from the common law collateral source rule, the statute expressly allows evidence of certain collateral source payments, but explicitly declines to extend this admissibility to payments in the form of "insurance benefits for which the plaintiff or members of the plaintiff's family have paid for directly." Id. § 34-44-1-2(1)(B).
The defendant's appellate claim is that the trial court erred in excluding his evidence offered to show the "adjustments to the [plaintiffs] medical bills." Br. of Appellant at 9. The refused evidence consisted of an assortment of hospital and medical bills and statements of account revealing the amount of contractual write-offs resulting from the plaintiffs insurance coverage (Anthem Blue Cross Blue Shield) and the amounts actually paid in full satisfaction of the medical bills by Anthem. Appellant's App'x at 73-86. The plaintiff testified that he had paid the Anthem insurance premiums. Id. at 56.
The collateral source statute expressly declines to authorize the admission of evidence of payments in the form of "insurance benefits for which the plaintiff or members of the plaintiff's family have paid for directly." Ind.Code § 34-44-1-2(1)(B). The trial court's exclusion of the defendant's evidence in this case was thus consistent with the statutory requirements. The rule pronounced by today's opinion, which invites admission of "discounted amount[s] actually paid," Maj. op. at 853, seems diametrically opposed to the statute's clear and unequivocal language. Statutory modification or nullification is best left to the General Assembly.
I also dissent to express my disagreement with the majority's statement that *862 the collateral source statute abrogated the common law collateral source rule. Supra at 854-55. The statute contains no words expressly abrogating the common law collateral source rule. Rather, the statute's precise language appears to create a limited exception to the common law rule, which .is otherwise left intact. From the statute's "the court shall allow" and "other than" language, I understand the statute merely to modify the common law rule to allow the admission of some collateral source payments but to deny this admission to life insurance, other death benefits, insurance benefits paid for by the plaintiff and the plaintiffs family, and government payments, thus leaving the common law rule in place as to these. The statute establishes a carefully crafted exception to the rule that narrowly allows only collateral source payments "other than" payments of benefits conferred from a plaintiff's own insurance or from government payments.
This interpretation of the collateral source statute seems conclusively governed by our well-established jurisprudence for determining the impact of a statute on existing common law:
When the legislature enacts a statute in derogation of the common law, this Court presumes that the legislature is aware of the common law, and does not intend to make any change therein beyond what it declares either in express terms or by unmistakable implication. In cases of doubt, a statute is construed as not changing the common law.
Bartrom v. Adjustment Bureau, Inc., 618 N.E.2d 1, 10 (Ind.1993) (internal citations omitted). In line with this bedrock principle, this Court consistently construes statutes in derogation of the common law strictly and applies them narrowly in a variety of contexts. See, eg., Dunson v. Dunson, 769 N.E.2d 1120, 1124-25 (Ind.2002); McKnight v. State, 658 N.E.2d 559, 562 (Ind.1995); McQuade v. Draw Tite, Inc., 659 N.E.2d 1016, 1018 (Ind.1995); Ind. State Highway Conm'n v. Morris, 528 N.E.2d 468, 473 (Ind.1988); Loftus v. State, 222 Ind. 139, 143-44, 52 N.E.2d 488, 490 (1944).
Given the controversial and significant evidentiary issues involved in the collateral source rule and any modification thereof, I am convinced the General Assembly carefully balanced strongly asserted competing interests and crafted statutory language to reflect a legislative intent to delicately modify but not abrogate the common law rule.[2]
As to the defendant's sole appellate claim that the trial court erroneously excluded his evidence of discounted payments for medical services, I believe that the trial court properly followed the collateral source statute and that the resulting judgment should be affirmed.
Unfair and Undesirable Judicial Policy
I also oppose the new rule because it is incomplete, misleading, and unfair, and *863 will add layers of complexity, time, and expense to personal injury litigation, impairing the efficient administration of justice.
The majority acknowledges that the proper measure of medical expense damages for a personal injury plaintiff is the reasonable value of such expenses but concludes that the complexity currently surrounding the state of health care pricing systems [3] favors giving defendants new tools, namely the evidence of discounted payments for such services, to challenge the plaintiffs evidence of presumptively reasonable medical expenses under Indiana Evidence Rule 413.
The new rule fails to take into account, however, that these contractual discounts confer significant benefits upon medical service providers in addition to just the cash received in discounted payments. In exchange for medical services, providers receive not only the insurer's payments, but also the pecuniary value of numerous additional benefits, among which are prompt payment, assured collectability, avoidance of collection costs, increased administrative efficiency, and significant marketing advantages.
It is widely recognized that, by agreeing to reduced rates, providers gain significant administrative and marketing advantages, "including a large volume of business, rapid payment, ease of collection, and occasionally advance deposits." Lawrence F. Wolper, Health Care Administration: Planning, Implementing, and Managing Organized Delivery Systems 553 (4th ed.2004); see also, eg., Arnold Birenbaum, Managed Care: Made in America 22 (1997) ("[Discounting] guarantees the hospital that a certain number of beds will be occupied."); William O. Cleverley & Andrew E. Cameron, Essentials of Health Care Finance 301 (6th ed.2006) (discounting attracts new blocks of patients); Steven R. Eastaugh, Health Care Finance: Economic Incentives and Productivity Enhancement 97 (2006) ("PPOs [preferred provider organizations] have an intuitive appeal as a mechanism for attracting fixed blocks of business.... Taking on PPO patients is analogous to taking credit card business in that you absorb the 3, 6, or 9 percent discounts in hopes of increasing the volume of new users to the hospital.... Generating new sources of revenues and new users of the hospital ... is the desideratum."); Shahram Heshmat, Framework for Market-Based Hospital Pricing Decisions 10 (1993) ("In return for obtaining preferred status (which is designed to increase the volume of business), providers make their services more attractive to payers through means such as discounting. ..."); Peter R. Kongstvedt, The Managed Health Care Handbook 82 (4th ed. 2001) ("[A] PPO may commit to pay all clean claims submitted by its providers within 15 days of submittal in return for a larger discount from charges."); Rockwell Schulz & Alton C. Johnson, Management of Hospitals and Health Services: Strategic Issues and Performance 40 (2003) ("The advantage to the [provider] in join *864 ing a PPO is access to more patients while retaining [a fee-for-service payment mechanism]."); Paul B. Ginsburg, The Dynamics of Market-Level Change, 22 J. Health Pol. Pol'y & L. 8638, 371 (1997) ("Managed care plans have pursued a number of strategies," including "to take advantage of seale economies in marketing and administration, and to increase market power in relation to both purchasers and providers."); Robert J. Kulak, Preferred Provider Organizations: On the Cutting Edge of Medical Delivery System Change, 2 Benefits Q. 4, 4-5 (1986) (in return for agreeing to provide services at previously negotiated rates, "providers can expect an increase in their market share, prompt payment and a reduction of administrative detail").
Even the Amicus Defense Trial Counsel of Indiana, which supports the defendant in this case, acknowledges that:
Discounted fee arrangements between healthcare providers and insurers are for their mutual benefit. Providers "discount" from their "customary rate" for managed care patients for a reason-to be included on a list of preferred network providers from which the managed care plan members are permitted to obtain healthcare without prior approval from the insurance company. Thus, providers bargain for a large panel of patients who are, to some extent, directed to them by the insurance company in exchange for discounting or writing-off their "customary" rates. The insurance company essentially obtains a bulk discount on medical services for the plan members. The insurers pass their savings onto the plan members in the form of lower premiums, which helps them attract more customers, representing even more potential business for providers.
Br. of Amicus Curiae Defense Trial Counsel of Indiana in Supp. of Appellant's Pet. for Transfer at 9-10 (internal citation omitted).
As recognized by the Virginia Supreme Court, "amounts written off are as much of a benefit for which [the plaintiff] paid consideration as are the actual cash payments made by his health insurance carrier to the health care providers." Acuar v. Letourmeau, 260 Va. 180, 531 S.E.2d 316, 322 (2000).
The majority acknowledges that other jurisdictions "have considered this issue with varying results." Supra at 855. Other observers, however, have more precisely recognized "the clear majority view" as that which permits injured plaintiffs "to claim and recover the full amount of [their] reasonable medical expenses for which [they were] charged, without any reduction for the amounts apparently written off by [their] healthcare providers pursuant to contractually agreed-upon rates with [their] medical insurance carriers." Lopez v. Safeway Stores, Inc., 212 Ariz. 198, 129 P.3d 487, 496 (2006) (emphasis added). Similarly, Professor Dobbs explains, "In line with the basic measure of damages-the reasonable value of the medical services rendered-most courts passing on the issue in recent years have made rulings that permit the plaintiff to prove all of the reasonable medical charges, ever though some of those charges were waived by the provider." [4] 2 *865 Dan B. Dobbs, The Law of Torts § 380, at 132-83 (2001 & supp.2005) (emphasis added). This dominant view comports with the fundamental purpose of the common law collateral source rule: "to prevent a tortfeasor from deriving any benefit from compensation or indemnity that an injured party has received from a collateral source." Acuar, 531 S.E.2d at 322. "[The focal point of the collateral source rule is not whether an injured party has 'incurred' certain medical expenses. Rather, it is whether a tort victim has received benefits from a collateral source that cannot be used to reduce the amount of damage owed by a tortfeasor." Id.
Thus, if we authorize consideration of the amount of discounted payments as evidence of the reasonable value of a plaintiff's medical services, juries will receive a distorted, misleading, and incomplete picture unless they are also able to consider the pecuniary value of all the benefits conferred upon health care providers in their symbiotic exchange with medical insurers. While today's new rule does not foreclose the admission of such essential evidence, its gathering and presentation will significantly burden both injured plaintiffs and efficient judicial administration. A new level of discovery will be needed to determine and quantify the value to providers. Plaintiffs will be required to expend considerable resources to marshal and present such evidence, thereby prolonging trials. New appellate issues will result. Not the least of these will be the challenge of devising a methodology to implement the majority's caveat that discounted amounts may be introduced only if done "without referencing insurance." Supra at 853, 858. Regardless of the technique used, it seems virtually impossible to deceive the common-sense inference of juries that insurance is the source of any discounted amounts paid to satisfy medical care accounts.
This all seems very unnecessary. Under today's new rule, the existence and extent of any improvement to the accuracy of verdicts seems overwhelmed by the significant probability of incompleteness, confusion, and resulting unfairness, all further compounded by detrimental effects on the fair and efficient administration of justice. These negative aspects can easily be avoided, without sacrificing fairness and justice, by recognizing that when medical providers agree to accept discounted amounts, the extent of the discount presumably reflects the value of the tangible and intangible benefits the providers receive in return.
For these reasons, I favor adherence to the common law collateral source rule, as narrowly modified by Indiana's collateral source statute, both of which were properly applied by the trial court in this case.
The Jury Instruction Correctly Stated the Law
I also disagree with the majority's observation that it was improper to instruct the jury that "[s]tatements of charges for medical, hospital or other health care expenses for diagnosis or treatment occasioned by an injury constitute prima [facie] *866 evidence that the charges are reasonable and fair." Supra at 859. This instruction closely tracks Rule 413, which provides: "Statements of charges for medical, hospital or other health care expenses for diagnosis or treatment occasioned by an injury are admissible into evidence. Such statements shall constitute prima facie evidence that the charges are reasonable." Ind. Evid. R. 413. I do not think a trial court errs by accurately instructing a jury as to what this Court's own rule establishes, especially when the record reflects no objection at trial by the defendant, when the defendant does not challenge the instruction on appeal, when the defendant agrees that the instruction accurately recited Rule 413, and when the defendant approvingly describes the instruction as "the proper measure of damages." See Br. of Appellant at 1, 6, 11.
"Statements of Charges" in Evidence Rule 413
Finally, to the extent the majority in its footnote 5 implies that "statements of charges" in Rule 418 are merely equivalent to "a financial account showing a balance due," I disagree. This Court mentioned this "[olne definition of 'statement'" only in passing when deciding that Rule 413 does not allow the admission of "future estimates of costs." Cook v. Whitsell-Sherman, 796 N.E.2d 271, 277 (Ind.2003). Cook did not hold that Rule 418 allows admission of statements of a remaining balance due after discounted payments, and such a holding would be inconsistent with Rule 4138's purpose.
The measure of damages for medical services is not the actual expenses incurred, nor is it the actual amount paid for such services, but is instead the reasonable value of the medical services rendered. As we noted in Butler v. Indiana Department of Insurance:
Under well-established principles of Indiana tort law, the extent of recovery by an injured plaintiff for medical expenses depends not upon what the plaintiff paid for such services but rather their reasonable value. Brosnan v. Sweetser, 127 Ind. 1, 9, 26 N.E. 555, 557 (1891); see also Penn. Co. v. Marion, 104 Ind. 239, 3 N.E. 874 (1885) (gratuitous medical services); City of Indianapolis v. Gaston, 58 Ind. 224 (Ind.1877) (same); Herrick v. Sayler, 160 F.Supp. 25, 27-30 (N.D.Ind.1958) (collecting cases and finding it "apparent that the law of Indiana will allow a plaintiff in a personal injury action to recover ... the reasonable and fair value of medical expenses").
904 N.E.2d 198, 202 (Ind.2009). Given that plaintiffs must prove the reasonableness and necessity of medical expenses, Rule 418 operates to simplify proof, obviating the expensive and time-consuming practice of calling witnesses to testify on issues that distract from principal matters at trial and substituting a statement of charges as prima facie proof of the reasonable value of medical service expenses. Cook, 796 N.E.2d at 277-78. I therefore disagree with the majority's implication that "statements of charges" in Evidence Rule 418 refers to a statement showing the balance due after receipt of an insurer's discounted payment pursuant to a preexisting insurer-provider agreement.
Conclusion
For the reasons expressed above, I dissent. But since the majority has chosen a new path, I find not unreasonable the procedural template implied and approved by the actual holding in today's majority opinion. The discounted medical expenses actually paid by the plaintiffs insurer are considered post-verdiet, without the jury's general damage assessment having been contaminated with such information and *867 the almost inevitable resulting implication that the plaintiff received insurance benefits. This avoidance of toxic evidence is parallel to the pro tanto post-verdict adjustment procedure we have approved when a plaintiff has received a pre-verdict partial settlement. See, e.g., Morris, 528 N.E.2d at 473-74.
RUCKER, J., concurs.

. This practical reality finds additional confirmation from the defendant's assertion that "it's likely the jury's verdict of $70,000 was influenced by the level of medical expenses it erroneously believed Walker had incurred." Br. of Appellant at 8.

. There is unfortunate language in Shirley v. Russell, in which this Court unanimously but gratuitously commented that the collateral source statute "abrogated the common law collateral source rule." 663 N.E.2d 532, 534 (Ind.1996). I am now convinced that this statement was both mistaken and unnecessary. Shirley involved a wrongful death action in which there was evidence that a decedent and his widow forewent a substantial portion of their pension in consideration of a survivor benefit. This Court found that the survivor annuity payment, "though perhaps not insurance for tax or regulatory purposes, has sufficient hallmarks of insurance to be deemed such for purposes of the new collateral source rule statute," and was therefore "not admissible in [the] estate's wrongful death claim." Id. at 536 (citing Ind.Code § 34-44-1-2(1)(B)). The application of the statute in Shirley is thus entirely consistent with the trial court's decision to exclude the discounted insurance benefit payments in the present case.

. The majority opinion, the concurrence, and this dissent discuss information from resources that are not part of the record of proceedings of this case. Indiana Code of Judicial Conduct Rule 2.9(C) declares that judges "shall not investigate facts in a matter independently, and shall consider only the evidence presented and any facts that may properly be judicially noticed." And Comment [6] explains that this prohibition "extends to information available in all mediums, including electronic." I understand this Rule's reference to the "facts in a matter" to mean the specific facts relating to the incident upon which a lawsuit is based, but that the Rule does not restrain appellate consideration of other general information helpful to the function of appellate courts in statutory inter *864 pretation and the advancement of common law.

. The bulk of courts appear to agree that reduced payments under arrangements between a plaintiff's insurer and the medical service providers are not admissible as evidence of reasonableness of the medical services because they constitute a collateral source. Acuar v. Letourneau, 260 Va. 180, 531 S.E.2d 316, 321-23 (2000); see, e.g., Baptist Healthcare Sys., Inc. v. Miller, 177 S.W.3d 676, 683-84 (Ky.2005); Onusko v. Kerr, 880 A.2d 1022, 1024-25 (Del.2005); Bozeman v. Louisiana, 879 So.2d 692, 704-05 (La.2004) *865 (embracing this rule "for plaintiffs who have paid some consideration for the collateral source benefits"); Covington v. George, 359 S.C. 100, 597 S.E.2d 142, 144 (2004); Hardi v. Mezzanotte, 818 A.2d 974, 985 (D.C.2003); Wal-Mart Stores, Inc. v. Frierson, 818 So.2d 1135, 1139-40 (Miss.2002) Koffman v. Leichtfuss, 246 Wis.2d 31, 630 N.W.2d 201, 209-10 (2001); Montgomery Ward & Co. v. Anderson, 334 Ark. 561, 976 S.W.2d 382, 384-85 (1998) (addressing gratuitous and discounted medical services); Goble v. Frohman, 848 So.2d 406, 410 (Fla.Dist.Ct.App.2003); Olariu v. Marrero, 248 Ga.App. 824, 549 S.E.2d 121, 123 (2001); Brown v. Van Noy, 879 S.W.2d 667, 676 (Mo.Ct.App.1994). Cf. Bynum v. Magno, 106 Hawai'i 81, 101 P.3d 1149, 1160-62 (2004).