**VOLUNTEERS OF AMERICA COLORADO BRANCH, a Colorado non-profit corporation, and Volunteers of America Foundation–Colorado, a Colorado non-profit corporation, both d/b/a Volunteers of America, Petitioners**

v.

**Wayne GARDENSWARTZ and Zachary C. Tucker, as co-personal representatives of Richard B. Tucker, Respondents.**

No. 09SC20.

Supreme Court of Colorado,
En Banc.

Nov. 15, 2010.

Hall & Evans, L.L.C., Peter Moyson, John T. Osgood, Denver, Colorado, Attorneys for Petitioners.

Darling Milligan Smith & Lesch, PC, Richard J. Lesch, Ryan D. Nelson, Denver, Colorado, Attorneys for Respondents.

Martin Conklin, P.C., John L. Conklin, J.R. Geraghty, Denver, Colorado, Attorneys for Amicus Curiae Kaiser Foundation Health Plan of Colorado.

Davis Graham & Stubbs, LLP, Dale Harris, Andrew Low, Denver, Colorado, Attorneys for Amicus Curiae Copic Insurance Company.

McDermott, Hansen & McLaughlin, LLP, William J. Hansen, Denver, Colorado, Attorney for Amicus Curiae Colorado Trial Lawyers Association.

Montgomery, Kolodny, Amatuzio & Dusabek, L.L.P., Todd Vriesman, Denver, Colorado, Murphy Decker Hensen & Cook–Olson, PC, C. Todd Drake, Littleton, Colorado, Harris, Karstaedt, Jamison & Powers, P.C., Heather A. Salg, Englewood, Colorado, Attorneys for Amicus Curiae Colorado Defense Lawyers Association.

Snell & Wilmer, L.L.P., Lee Mickus, Denver, Colorado, Attorney for Amicus Curiae Colorado Civil Justice League.

Chief Justice MULLARKEY delivered the Opinion of the Court.

On certiorari review, we consider whether a successful tort plaintiff may recover damages for the full amount of medical expenses incurred, or may recover only the discounted amount paid by the third-party insurance company. We hold that under the collateral source rule, as codified by the contract clause of section 13–21–111.6, C.R.S. (2010), the plaintiff may recover in full. We therefore affirm the court of appeals. *Tucker v. Volunteers of America Colo. Branch*, 211 P.3d 708, 713 (Colo.App.2008).

## I. Facts and Proceedings Below

The plaintiff, Richard B. Tucker,[1] was injured when he fell at an event sponsored by Volunteers of America Colorado Branch and Volunteers of America Foundation–Colorado (collectively "VOA"). He was billed $74,242 for medical services as a result of his injuries.[2]

Prior to the accident, Tucker purchased a health insurance policy from Aetna, for which he regularly paid premiums. Aetna was able to satisfy Tucker's medical debts with a payment of $43,236, which reflected $31,006 in medical discounts that the company had negotiated with his healthcare providers. Aetna thereby indemnified Tucker for the medical expenses that he incurred as a result of the tort committed against him. Tucker's policy included a subrogation clause entitling Aetna "to repayment of the full cost of all benefits provided by HMO on behalf of the

Member that are associated with the injuries . . . for which another party is . . . responsible."

Tucker brought a tort claim against VOA for his injury. The jury awarded Tucker $81,385 in economic losses and $60,000 in non-economic losses for a total of $141,385. Because Tucker was found to be 49% at fault, his total jury award would have been $72,106. However, the trial court determined that under section 13–21–111.6, the jury verdict should be reduced to reflect the healthcare discounts secured by Aetna. It applied a formula[3] to the economic losses component of the award and subtracted 80.8% of the healthcare write offs, a total of $34,935, from the total jury award of $141,385, leaving $106,450 in damages. Because Tucker was 49% at fault, the trial court further reduced Tucker's damages award to $54,290.

The court of appeals reversed, holding that the healthcare discounts fell under the contract exception of section 13–21–111.6 and therefore did not provide a proper basis for reducing the award. *Tucker v. Volunteers of America Colo. Branch*, 211 P.3d 708, 713 (Colo.App.2008).[4]

## II. Collateral Source Rule

An understanding of the common law collateral source rule is essential in interpreting section 13–21–111.6, which codifies the collateral source rule.

▮▮▮ Under the common law collateral source rule, making the injured plaintiff whole is solely the tortfeasor's responsibility.

---

1. Respondents Wayne Gardenswartz and Zachary C. Tucker are Richard B. Tucker's personal representatives.

2. A transcript of the trial proceedings is not part of the record before us. According to Tucker, the parties stipulated to the admission of the healthcare providers' medical bills at trial and Tucker presented expert testimony that the services rendered were medically necessary, and that the amounts billed represented the reasonable value of the services provided. At oral argument, VOA conceded that because the trial court had ruled in limine that it would apply section 13–21–111.6 post-verdict, it did not submit evidence at trial regarding the value of the medical services.

3. First it reduced Tucker's $81,385 economic damages award by his total amount of miscella-

neous expenses of $15,626, leaving $65,759, which represented 80.8% of the total amount of the medical expenses submitted by plaintiff. The court then applied the 80.8% reduction to the $43,236 paid to his healthcare providers, leaving $34,935. It subtracted $34,935 from the total jury award of $141,385.

4. We granted certiorari review on the following issue: Whether the statutory Collateral–Source Rule, § 13–21–111.6, C.R.S., requires or prohibits an award to a tort plaintiff for the amount of medical expenses for which the plaintiff has no liability because the expenses exceed the prices that are established under a private contract between a health-care insurer and health-care provider.

Any third-party benefits or gifts obtained by the injured plaintiff accrue solely to the plaintiff's benefit and are not deducted from the amount of the tortfeasor's liability. These third-party sources are "collateral" and are irrelevant in fixing the amount of the tortfeasor's liability.

■ The rule therefore allows double recovery by a successful plaintiff. "[C]ompensation or indemnity received by an injured party from a collateral source, wholly independent of the wrongdoer and to which [the wrongdoer] has not contributed, will not diminish the damages otherwise recoverable from the wrongdoer." *Colo. Permanente Med. Grp., P.C. v. Evans*, 926 P.2d 1218, 1230 (Colo.1996) (quoting *Kistler v. Halsey*, 173 Colo. 540, 545, 481 P.2d 722, 724 (1971)); *see also Crossgrove v. Wal–Mart Stores*, ——— P.3d ———, ———-——— (Colo.App.2010) (selected for publication) (discussing common law origins of collateral source rule).

■ The rule's purpose is to prevent a tortfeasor from benefitting, in the form of reduced liability, from compensation in the form of money or services that the victim may receive from a third-party source. *See Quinones v. Pa. Gen. Ins. Co.*, 804 F.2d 1167, 1171 (10th Cir.1986) ("The rule evolved around the commonsense notion that a tortfeasor ought not be excused because the victim was compensated by another source, often by insurance."). Accordingly, the rule is somewhat punitive in nature. It prohibits the wrong-doer from enjoying the benefits procured by the injured plaintiff. If either party is to receive a windfall, the rule awards it to the injured plaintiff who was wise enough or fortunate enough to secure compensation from an independent source, and not to the tortfeasor, who has done nothing to provide the compensation and seeks only to take advantage of third-party benefits obtained by the plaintiff. *See Van Waters & Rogers, Inc. v. Keelan*, 840 P.2d 1070, 1074 (Colo.1992) ("To the extent that either party received a windfall, it was considered more just that the benefit be realized by the plaintiff in the form of double recovery rather than by the tortfeasor in the form of reduced liability.").

■ Double recovery is permitted to an injured plaintiff because the plaintiff "should be made whole by the *tortfeasor*, not by a combination of compensation from the tortfeasor and collateral sources. The wrongdoer cannot reap the benefit of a contract for which the wrongdoer paid no compensation." *Acuar v. Letourneau*, 260 Va. 180, 531 S.E.2d 316, 323 (2000) (emphasis added) (holding that, under the collateral source rule, tortfeasor may not reduce a plaintiff's award by the amounts written off by plaintiff's healthcare providers).

■ Under this rule, the benefits received by an injured plaintiff due to the plaintiff's third-party health insurance coverage are from a collateral source, and therefore are not to be considered in determining the amount of the plaintiff's recovery.

> [I]t is the position of the law that a benefit that is directed to the injured party should not be shifted so as to become a windfall for the tortfeasor. If the plaintiff was himself responsible for the benefit, as by maintaining his own insurance ... the law allows him to keep it for himself. If the benefit was a gift to the plaintiff from a third party or established for him by law, he should not be deprived of the advantage that it confers.

Restatement (Second) of Torts, § 920A, cmt.b (1979); *see Van Waters*, 840 P.2d at 1075 (citing same). The plaintiff's health insurance benefits certainly are not to be credited to the tortfeasor in reducing the plaintiff's award. *See* Dag E. Ytreberg, *Collateral Source Rule: Injured Person's Hospitalization or Medical Insurance as Affecting Damages Recoverable*, 77 A.L.R. Fed. 415 (1977).

■ To ensure that a jury will not be misled by evidence regarding the benefits that a plaintiff received from sources collateral to the tortfeasor, such evidence is inadmissible at trial. *Carr v. Boyd*, 123 Colo. 350, 356–57, 229 P.2d 659, 662–63 (1951). It is also inadmissible in adjusting or reducing a plaintiff's damages award. *See Crossgrove*, —— P.3d at ———-——. Thus, the collateral source rule prohibits a jury or trial court from ever considering payments or compen-

sation that an injured plaintiff receives from his or her third-party insurance.

### III. Section 13–21–111.6

In 1986 the General Assembly modified the common law collateral source rule to a limited extent by enacting section 13–21–111.6 as part of a package of tort reforms. *See* ch. 107, sec. 3, § 13–21–111.6, 1986 Colo. Sess. Laws 677, 679; *see also, Van Waters*, 840 P.2d at 1077.

Section 13–21–111.6 has two contrasting clauses. The first clause partially negates the collateral source rule. It directs a trial court, following a damages verdict, to adjust the plaintiff's award by deducting compensation or benefits that the plaintiff received from collateral sources (i.e., sources other than the tortfeasor). The second clause, described as the "contract exception" or the "contract clause," retains the collateral source rule for certain benefits. *See Colo. Permanente Med. Grp.*, 926 P.2d at 1230.

The statute provides as follows:

In any action by any person or his legal representative to recover damages for a tort resulting in death or injury to person or property, the court, after the finder of fact has returned its verdict stating the amount of damages to be awarded, shall reduce the amount of the verdict by the amount by which such person, his estate, or his personal representative has been or will be wholly or partially indemnified or compensated for his loss by any other person, corporation, insurance company, or fund in relation to the injury, damage, or death sustained; *except that* the verdict shall not be reduced by the amount by which [the injured plaintiff] has been or will be wholly or partially indemnified or compensated by a benefit paid as a result of a contract entered into and paid for by or on behalf of such person.

§ 13–21–111.6 (emphasis added).

 Statutes in derogation of the common law must be strictly construed. *See Van Waters*, 840 P.2d at 1076 ("if the legislature wishes to abrogate rights that would otherwise be available under the common law, it must manifest its intent either expressly or

by clear implication"). Section 13–21–111.6 did not sweep away the common law collateral source rule entirely. It only requires post-verdict offset of certain compensation received by the plaintiff. No offset is permitted if the benefits arise out of a contract entered into on the plaintiff's behalf. Specifically, under section 13–21–111.6, a tortfeasor is not entitled to offset proceeds resulting from a plaintiff's purchase of insurance. *Id.* at 1075. For purposes of this case, the common law collateral source rule remains in full force and effect.

We interpreted the effect of section 13–21–111.6 on the collateral source rule in *Van Waters & Rogers, Inc. v. Keelan*, 840 P.2d 1070, 1074 (Colo.1992). In *Van Waters*, a tortfeasor injured a firefighter and, as a result of his injuries, the firefighter became occupationally disabled. *Id.* at 1072. The firefighter began receiving disability payments from his pension fund. *Id.* Relying on section 13–21–111.6, the tortfeasor sought to reduce the firefighter's damages award by the amount of his independently procured disability payments. *Id.*

We rejected the tortfeasor's attempt. First we determined that the language of section 13–21–111.6 was ambiguous and turned to other factors, including examining the legislative history, to determine the proper scope of the contract clause. *Id.* at 1077. We explained that although the history of the statutory provision indicated that the

general goal of section 13–21–111.6 was to limit double recoveries[, i]t also shows, however, an intent not to deny a plaintiff compensation to which he is entitled by virtue of a contract that either he, or someone on his behalf, entered into and paid for with the expectation of receiving the consequent benefits at some point in the future.

*Id.* at 1078. We concluded that the contract clause "clearly denies the setoff of benefits that result from private insurance contracts for which someone pays monetary premiums" and reasoned that in such cases, concerns about double recovery are mitigated by "the fact that the benefits were previously paid for by the person or by someone else on the person's behalf." *Id.* at 1078.

Even though the firefighter had not paid premiums towards his disability benefits, we ruled that the contract clause was broad enough to include contracts "for which a plaintiff gives some form of consideration." *Id.* at 1079. Because the firefighter had given consideration in the form of employment services, the disability payments were "entitled to the same protection against offset that would apply to benefits received as a result of an insurance contract for which that person had paid money." *Id.*

Therefore, we ruled that section 13–21–111.6 does not permit a tortfeasor to offset an injured plaintiff's benefits when they arise out of a contract entered into on the plaintiff's behalf. We expressly stated that the statute does not allow a tortfeasor to offset proceeds resulting from a plaintiff's purchase of insurance. *Id.* at 1078.

## IV. The Contract Clause and Tucker's Insurance Policy

██ Because Tucker was indemnified for the entire amount of medical services billed against him as a result of the health insurance contract that he had purchased, his case falls squarely within the contract clause in section 13–21–111.6. Tucker therefore gets the benefit of the collateral source rule. The benefits from his Aetna policy, including the healthcare provider discounts, are from a collateral source, and the tortfeasor, VOA, may not use them to reduce its liability.

Tucker's healthcare providers billed $74,242 for their services in treating his injuries. Because Tucker had purchased a health insurance policy, his insurance company, Aetna, satisfied his medical debts with a payment of $43,236. Moreover, Tucker's purchase of insurance meant that he could not be billed the difference between the amounts billed by his healthcare providers and his insurer's actual payments. *See* § 10–16–705(3), C.R.S. (2010) ("Every contract between a carrier and a participating provider shall set forth a hold harmless provision specifying that covered persons shall, in no circumstances, be liable for money owed to participating providers by the plan and that in no event shall a participating provider collect or attempt to collect from a covered

person any money owed to the provider by the carrier. Nothing in this section shall prohibit a participating provider from collecting coinsurance, deductibles, or copayments as specifically provided in the covered person's contract with the managed care plan.").

By agreeing to a provider contract with Aetna and accepting payment on Tucker's behalf, the healthcare providers gave up the right to seek compensation from Tucker for the amount billed. Tucker was thereby fully indemnified for the medical expenses that he incurred as a result of the tort committed against him.

The write offs required of Tucker's medical providers arose out of a contractual agreement between Tucker and a third party, i.e., the insurance company that negotiated the discounts. If Tucker had not been insured, the write offs would not have been applied to his medical bills and he would have been responsible for the billed amount. Thus, the write offs "are as much of a benefit for which [a plaintiff] paid consideration as are the actual cash payments by his health insurance carrier to the health care providers." *Acuar*, 531 S.E.2d at 322–23.

The collateral source rule prevents VOA from standing in Tucker's shoes and enjoying the same discounted medical rates as his insurance company receives. To hold otherwise "is to allow the tortfeasor to receive a windfall in the amount of the benefit conferred to the plaintiff from a source collateral to the tortfeasor." *Pipkins v. TA Operating Corp.*, 466 F.Supp.2d 1255 (D.N.M.2006). The General Assembly wrote the contract clause to preserve the common law collateral source rule and prevent a windfall to a tortfeasor when a plaintiff received benefits arising out of the plaintiff's contract. By retaining the collateral source rule through the contract clause, the General Assembly avoided this unjust result.

We reject VOA's arguments to the contrary. VOA contends that the contract clause of section 13–21–111.6 includes only the amount that Aetna actually paid to Tucker's healthcare providers. VOA argues that it is entitled to benefit from the $31,006 in

savings from Tucker's insurance and offset these savings to its benefit.

First, VOA contends that the medical discounts negotiated between insurers and healthcare providers are not contracts that are "entered into and paid for by or on behalf of" covered plaintiffs, and therefore do not come within the ambit of the contract clause. Instead, asserts VOA, insurers and healthcare providers enter into discounted pricing agreements only for their mutual benefit. Because Tucker was not an intended beneficiary of this agreement between Aetna and Tucker's healthcare providers, VOA argues that the first clause of section 13–21–111.6 applies and he may not benefit from the collateral source rule.

We reject this contention. The salient contract is the contract between Tucker and his insurance company, which gave rise to the discounted medical care pricing that VOA seeks to use in limiting its tort liability. Tucker's healthcare providers' write offs or discounts are a direct result of an insurance contract that Tucker entered into and paid for on his behalf.

Moreover, write offs or pricing contracts inure to the benefit of the insurance company, the healthcare provider, and the covered plaintiff. The health insurance company's primary purpose is to attract and retain customers. The insurance company seeks and obtains write offs or pricing contracts from healthcare providers in order to attract consumers based on a lower price for premiums. In addition to increasing the insurance company's customer base, such write offs or pricing contracts inure to the benefit of insured persons like Tucker by reducing the rate of health insurance premiums.

The healthcare providers benefit as well, in part by expanding their patient base. There are many reasons why insurance companies and healthcare providers enter into contracts that discount the full amount charged by the providers. For example, the insurance company's ability to pay a large volume of claims promptly may be attractive to providers seeking to minimize the cost of collections and bad claims. The provider may also be interested in having access to a larger pool of patients who have health insurance coverage.

See *Crossgrove*, 2010 WL 2521744, at *3; *see also Stanley v. Walker*, 906 N.E.2d 852, 863–64 (Ind.2009) (Dickson, J., dissenting) (discussing reasons for discounted healthcare fee arrangements between healthcare providers and insurers). By paying health insurance premiums, insured plaintiffs like Tucker gain access to a pool of providers who will not erect barriers to his receipt of medical care based on his ability to pay.

Because the interests of the insurance company, the insured, and the healthcare provider are intertwined, it is an inaccurate oversimplification to assert that Tucker's insurer and healthcare providers entered into the write off contracts only to serve their own ends and not on Tucker's behalf. The contract between Tucker's insurance company and providers operates, at least in part, to his benefit. More importantly, the discounted medical rates paid by his insurance company are a direct result of his health insurance contract, and therefore VOA may not claim these discounts to reduce its liability for the medical care that he received.

Second, VOA asserts that the healthcare provider discounts do not fall within the contract clause because they do not constitute a "benefit paid." VOA contends that the pricing differential between the amounts billed and the amounts paid is illusory because the charges are never actually paid by anyone. VOA also argues that because Tucker was prohibited from being legally liable for the difference between the amounts billed by his providers and the amount paid by his insurance company, he was not directly benefited by his insurance company's pricing contract.

However, by discharging Tucker's obligations to his medical providers, the insurer's remittances do constitute a "benefit" that was "paid." If Tucker had not had insurance coverage, he would have been liable for the entire amount billed or he may not have been treated at all. *See Trevino v. HHL Financial Services, Inc.*, 945 P.2d 1345, 1350 (Colo. 1997) ("When a hospital treats a patient's injuries, it has an enforceable claim for full payment for its services, regardless of the patient's financial status.").

Because he was insured, his medical providers wrote off part of the value of the medical services that they provided because they were contractually obligated to do so. *See Acuar*, 531 S.E.2d at 322–23; *see also Lopez v. Safeway Stores, Inc.*, 212 Ariz. 198, 129 P.3d 487, 495 (Ariz.Ct.App.2006) (holding that under the collateral source rule, the plaintiff is "entitled to claim and recover the full amount of her reasonable medical expenses for which she was charged, without any reduction for the amounts apparently written off by her healthcare providers pursuant to the contractually agreed-upon rates with her medical insurance carriers"). Because this is a benefit paid for by Tucker through the payment of his health insurance premiums, co-payments, and deductibles, it should not be deducted from his award. *See Van Waters*, 840 P.2d at 1078 n. 5 (examining the legislative history of section 13–21–111.6 and quoting Senator Meiklejohn's comment that "things that [a plaintiff] is paying for one way or the other ... ought [not] be deducted from a judgment").[5]

We recognize that there may be a disparity between the cost of medical services that are billed to a consumer and the amounts that are actually paid by insurance companies. It can be tempting to treat the discounted amounts as being a truer reflection of a plaintiff's damages. However, the write offs reflect the negotiating power of Tucker's insurer and its successful leverage in requiring providers to accept discounted reimbursement:

> Although "discounting" of medical bills is a common practice in modern healthcare, it is a consequence of the power wielded by those entities, such as insurance companies, employers and governmental bodies, who pay the bills. While large "consumers" of healthcare such as insurance companies can negotiate favorable rates, those who are uninsured are often charged the full, undiscounted price. In other words, simply because medical bills are often discounted does not mean that the plaintiff is

not obligated to pay the billed amount. Defendants may, if they choose, dispute the amount billed as unreasonable, but it does not become so merely because plaintiff's insurance company was able to negotiate a lesser charge.

*Arthur v. Catour*, 345 Ill.App.3d 804, 281 Ill.Dec. 243, 803 N.E.2d 647, 649 (2004) (under the collateral source rule, the "plaintiff's damages are not limited to the amount paid by her insurer, but may extend to the entire amount billed, provided those charges are reasonable expenses of necessary medical care").

Furthermore, the trial setting is the proper forum for the parties to present evidence regarding the proper value of an injured plaintiff's damages. As noted above, the trial transcript is not before us but VOA conceded at oral argument that it chose not to contest the valuation of Tucker's medical benefits because the trial court had ruled in limine that it would apply an offset under section 13–21–111.6. The jury determined Tucker's damages award accordingly. It is unwarranted speculation to substitute Aetna's discounted healthcare provider rates for the jury's determination regarding the reasonable value of the medical services rendered to Tucker.

We also reject VOA's contention that, contrary to the collateral source rule and the contract clause, a plaintiff's investment in his own insurance should operate to the benefit of the plaintiff's tortfeasor. Crediting VOA with the healthcare discounts paid for by Tucker's independently purchased health insurance would in effect penalize Tucker for his foresight in purchasing health insurance. Indeed, limiting Tucker to recovery only of his healthcare provider's discounted rates would under-compensate Tucker because he would receive no reimbursement for the premiums, co-payments, and deductibles that he has paid in obtaining and maintaining his health insurance. This does not comport with the legislature's enactment of the con-

---

5. We are not aware of any discussion of healthcare provider write offs or discounts in the legislative history, and VOA has identified no relevant history. Write offs and discounts may not have been common in 1986. At oral argument, VOA

suggested that the General Assembly had not foreseen the advent of managed care health plans and their practice of requiring provider discounts.

tract clause or the interpretation of section 13–21–111.6 in *Van Waters*.

Although the General Assembly was concerned about reducing tort awards and eliminating double recovery in some senses, the legislature would have eliminated the collateral source rule entirely if this had been its only concern. The General Assembly did not go that far. Instead, it chose to allow a plaintiff to obtain the benefit of his contract, even if the award resulted in a double recovery. This is consistent with the common law position that it is more repugnant to shift the benefits of the plaintiff's insurance contract to the tortfeasor in the form of reduced liability when the tortfeasor paid nothing toward the health insurance benefits.

Moreover, the General Assembly was also concerned about fairness in damages awards. *See Van Waters*, 840 P.2d at 1078 n. 5 (examining the legislative history of section 13–21–111.6 and quoting Senator Meiklejohn's comment that "[t]here's something unfair about me getting killed and my wife suing somebody and collecting, my insurance pays off and that goes as a credit against the judgment"). Crediting the financial windfall arising from Aetna's discounted rates to the injured plaintiff is consistent with the principles of the collateral source rule. *See Acuar*, 531 S.E.2d at 322 (The focus "is not whether an injured party has 'incurred' certain medical expenses. Rather, it is whether a tort victim has received benefits from a collateral source that cannot be used to reduce the amount of damages owed by a tortfeasor."). This point is made by the court in *Hardi v. Mezzanotte*:

> [A] private insurance carrier paid [plaintiff's] medical expenses. That source is wholly independent of [the tortfeasors]. Because any write-offs conferred would have been a byproduct of the insurance contract secured by [plaintiff], even those amounts should be counted as damages. Therefore, because any write-offs enjoyed by [plaintiff] were negotiated by her private insurance company, a source independent of [the tortfeasors], they should be included in her damages. Under the collateral source rule, she is entitled to all benefits resulting from her contract.

818 A.2d 974, 985 (D.C.2003) (internal citations omitted).

It is unjust to transfer the financial benefits of purchasing and maintaining health insurance to the tortfeasor, and the General Assembly's contract exception avoids this result. *See also Van Waters*, 840 P.2d at 1078 (the legislative history "shows [ ] an intent not to deny a plaintiff compensation to which he is entitled by virtue of a contract that either he, or someone on his behalf, entered into and paid for with the expectation of receiving the consequent benefits at some point in the future").

Our holding is consistent with the statutory contract clause and the rationale of the collateral source rule, which reject the notion that a tortfeasor may draw on sources wholly collateral to itself to reduce the compensation owed to the injured plaintiff. This result is also consistent with the principle that statutes in derogation of the common law are to be construed narrowly.

Here, the write offs that Tucker's healthcare providers applied to his medical bills were a direct result of the benefits negotiated by his health insurance company, which is a source independent of the tortfeasor. *See Hardi*, 818 A.2d at 985. Therefore, VOA may not receive any consideration or benefit from the write off or discount provisions of Tucker's health care contract.

## V. Conclusion

For the above reasons, we affirm the court of appeals' decision. We remand this case to the court of appeals so that it may be returned to the trial court for further proceedings consistent with this opinion.

Justice RICE dissents, and Justice COATS and Justice EID join in the dissent.

Justice RICE dissents.

In enacting section 13–21–111.6, C.R.S. (2010), the Colorado legislature sought to limit double recoveries for tort plaintiffs, abrogating the common law collateral source rule by requiring the setoff of most third-party recompense for tort injuries from damage awards against tortfeasors. Misconstru-

ing the statute in unwarranted deference to the abrogated common law rule, the majority reconstitutes the same type of double recovery that the legislature intended the statute to prevent.

The contract exception of section 13–21–111.6 is not, as the majority holds, a wholecloth codification of the common law collateral source rule. Rather, it is a narrow exception to the statute's general elimination of double recoveries by tort plaintiffs, excluding from setoff a carefully circumscribed class of benefits that are actually paid to a tort plaintiff pursuant to a contract negotiated on the plaintiff's behalf. Because the difference between the amount billed by healthcare providers for a plaintiff's treatment and the amount actually paid by the plaintiff's insurer is neither paid to the plaintiff nor negotiated on his behalf, the difference does not qualify for the contract exception and therefore should be set off from the plaintiff's award. Because the majority holds to the contrary in the face of the legislature's clear intent, the statute's plain language, and sound public policy, I dissent.

## I. Section 13–21–111.6 and Legislative Intent

The majority rests its holding on the principle that "[s]tatutes in derogation of the common law must be strictly construed." Maj. op. at 1084 (citing *Van Waters & Rogers, Inc. v. Keelan*, 840 P.2d 1070, 1076 (Colo. 1992)). That maxim, however true, does not allow this Court to neglect its primary duty in interpreting a statute: to give effect to the intent of the General Assembly and the purpose of the statute's legislative scheme. *See Van Waters*, 840 P.2d at 1076. If the legislature clearly seeks to abrogate a common law rule via statute, this Court must give effect to that intent when interpreting the statute. *See Pigford v. People*, 197 Colo. 358, 360, 593 P.2d 354, 356 (1979).

The common law collateral source rule precluded trial courts from setting off from a tort plaintiff's recovery any recompense the plaintiff received for his injuries from collateral sources—that is, sources other than the tortfeasor. *Van Waters*, 840 P.2d at 1074. The plain language of the first clause of section 13–21–111.6 evinces the legislature's clear intent to abrogate the common law rule by requiring trial courts to set off such recompense:

> [T]he court . . . shall reduce the amount of [a tort award] by the amount by which [the tort victim] has been or will be wholly or partially indemnified or compensated for his loss by any other person, corporation, insurance company, or fund in relation to the injury, damage, or death sustained. . . .

§ 13–21–111.6. Even after subjecting the statute to the same strict construction the majority demands here, this Court held in *Van Waters* that the legislature clearly intended section 13–21–111.6 to abrogate the common law rule and require the setoff of all collaterally sourced recompense not explicitly exempted by the second clause of the statute. 840 P.2d at 1076.

The second clause of section 13–21–111.6 exempts from setoff under the first clause a limited class of benefits actually paid to the plaintiff pursuant to a contract negotiated on his behalf:

> [E]xcept that the verdict shall not be reduced by the amount by which [the tort victim] has been or will be wholly or partially indemnified or compensated by a benefit paid as a result of a contract entered into and paid for by or on behalf of [the tort victim]. The court shall enter judgment on such reduced amount.

§ 13–21–111.6. Utilizing the same strict construction, this Court held in *Van Waters* that the legislature clearly intended the second clause to be an *exception* to the first clause, precluding setoff only of contractual benefits for which a plaintiff gives some form of consideration with the expectation of receiving future benefits. 840 P.2d at 1079.[1]

In short, the plain text of the statute, the legislative history, and this Court's holding in *Van Waters* all establish the first clause of

---

1. The legislature's goal in including the contract exception was simply to insure that benefits a tort plaintiff "pay[s] for one way or the other" are not offset from a judgment. *Van Waters*, 840

P.2d at 1078 (quoting *Hearing on S.B. 67 Before the S. Bus. & Labor Comm.*, 55th Gen. Assemb. (Colo.1986) (statement of Sen. Meiklejohn) [hereinafter *Hearing* ] ).

section 13–21–111.6 as an express abrogation of the common law collateral source rule and the second clause as a limited exception for benefits that are actually paid to the tort plaintiff pursuant to a contract negotiated and paid for by the plaintiff or on his behalf.

Casting aside this well-established foundation, the majority marginalizes section 13–21–111.6 in favor of the common law rule, deeming the second clause of the statute an effective codification of the common law rule and the first clause merely a "limited" modification thereof. Maj. op. at 1083–84. Even in the face of the legislature's express intent to abrogate the common law rule, the majority proclaims that, "[f]or purposes of this case, the common law collateral source rule remains in full force and effect." Maj. op. at 1084. On the foundation of that statement, the majority proceeds to rebuild the statute's limited contract exception into a vehicle for tort plaintiffs to recover nearly any theoretical damages that are mitigated by their insurance policies.

## II. The Contract Exception and Tucker's Insurance Policy

To accomplish this expansion of the statute's contract exception, the majority superimposes the legal framework of the common law collateral source rule over the contract exception, notwithstanding the contract exception's substantial facial limitations. The majority cites *Van Waters* for the proposition that "a tortfeasor [cannot] offset proceeds resulting from a plaintiff's purchase of insurance." Maj. op. at 1085. The majority then holds that the difference between the amount Tucker's healthcare providers billed him for his treatment and the amount Aetna actually paid to satisfy his liability to the providers constitutes a collateral source. *Id.* From that conclusion, the majority reasons that the difference necessarily satisfies the contract exception and therefore cannot be set off from Tucker's award. *Id.*

Contrary to the majority's holding, the contract exception does not give a tort plaintiff the ability to recover the amount of any theoretical liability to his healthcare providers that might have existed had he not carried health insurance. Instead, it merely

exempts a limited set of collaterally sourced benefits from the general setoff requirements of section 13–21–111.6. *Van Waters,* 840 P.2d at 1075. In particular, the contract exception only applies to benefits that an insurer or other collateral source *actually pays* the plaintiff pursuant to a contract negotiated and paid into *on his behalf. Id.* Here, Aetna never paid Tucker the difference between the amounts billed and paid, nor did Aetna negotiate that difference on Tucker's behalf. Accordingly, the difference does not qualify for the contract exception.

## III. "Benefits Paid" Under the Contract Exception

The only benefit Aetna actually "paid" Tucker pursuant to his insurance policy was indemnification of his liability to his healthcare providers. The value of an indemnification of liability inherently cannot exceed the indemnified person's liability—in this case, Tucker's liability to the providers for his treatment. In other words, Aetna could not have indemnified Tucker for an amount greater than Tucker ever owed the providers. Therefore, the value of the benefit Aetna paid to Tucker was not, as the majority holds, the theoretical amount Tucker would have been liable for had he not carried insurance, but rather the amount Aetna owed the providers for Tucker's treatment under Aetna's pre-negotiated pricing contracts with the providers.

As the majority concedes, section 10–16–705(3), C.R.S. (2010), requires insurers to indemnify insureds of liability to providers. Maj. op. at 1085. Because Tucker carried his insurance policy at all relevant times, he was *never* liable to his providers for the difference between the amounts billed and paid. Furthermore, as the majority also concedes, the providers, by entering into the pricing contracts with Aetna, waived the right to recover the difference from Tucker. Maj. op. at 1085.

Because Tucker was never liable to the providers for the difference between the amounts billed and paid, and because the providers had no right to recover the difference from him, the difference merely represented Tucker's theoretical liability had he

not carried insurance. Since Tucker carried insurance at all relevant times, the billed amount never reflected any actual liability of Tucker to his providers, and therefore was not a part of the benefit that Aetna "paid" Tucker by indemnifying him against liability.

Rather, the difference served only to give the jury a financial benchmark for the extent of Tucker's injuries without introducing prejudicial evidence that Tucker carried insurance. Because Tucker was never liable for the difference, the only logical valuation for Tucker's indemnification under his insurance policy is the amount that Aetna pre-negotiated with providers for Tucker's treatments. Thus, the trial court properly set off the difference between the amounts billed and paid under section 13–21–111.6.

## IV. Negotiation of Pricing Discounts

Compounding the error of the majority's holding that Aetna "paid" Tucker the difference between the amounts billed and paid is the fact that Aetna never negotiated the difference on Tucker's behalf, as is required for the difference to qualify for the contract exception. The majority insists that the contract between Tucker and Aetna—namely, Tucker's insurance policy—directly resulted in Aetna entering into discounted pricing contracts with Tucker's healthcare providers, leading to the difference in the amounts that Tucker's providers billed him and that Aetna actually paid. Maj. op. at 1086. The majority's account of the relationship between Tucker and Aetna, however, does not accord with the reality of relationships between insurers and insureds in Colorado.

Aetna's regulatory obligations under 3 Colo.Code Regs. § 702–4:4–7–1(12)(A) required it to enter into pricing contracts with the providers *before* selling insurance policies to Tucker or anyone else. While Aetna may have generally negotiated the contracts on behalf of its future insureds in the sense that it could not legally insure them without the contracts, Aetna could not have negotiated with the providers specifically on Tucker's behalf because it necessarily negotiated the pricing contracts before it had any relationship with Tucker.

The majority also asserts that discounted pricing contracts like those between Aetna and Tucker's providers "inure to the benefit of insured persons like Tucker by reducing the rate of health insurance premiums." Maj. op. at 1086. While it is possible that Aetna could have passed its savings from the discounted pricing contracts directly to Tucker in the form of lower premiums, it is equally possible that Aetna simply captured the savings in the form of lower costs, solely on its own behalf rather than Tucker's. The majority cites no evidence connecting Aetna's savings from its pricing contracts to the cost of Tucker's premiums.

In short, there is no direct link between Aetna's state-compelled, self-interested negotiation of discounted pricing contracts and Tucker himself. Aetna did not negotiate on Tucker's behalf the difference between what Tucker's providers billed him and what Aetna actually paid. That amount therefore does not qualify for the contract exception.

## V. Public Policy

Finally, the majority implies that its holding comports with public policy, citing the common law's distaste for "shift[ing] the benefits of the plaintiff's insurance contract to the tortfeasor in the form of reduced liability when the tortfeasor paid nothing toward the health insurance benefits." Maj. op. at 1088. The majority contends that this concern was more important to the legislature than the concern of eliminating double recoveries, quoting Senator Meiklejohn's comment from the legislative history that "[t]here's something unfair about me getting killed and my wife suing somebody and collecting, [sic] my insurance pays off and that goes as a credit against the judgment." *Id.*

The majority, however, does not present Senator Meiklejohn's comments in their entirety, omitting in particular his subsequent comment:

*I don't think a person ought to collect more than once ... for the hospitalization costs and things like that. The question really is who should pay that ... [. I]f my insurance company pays my hospitalization as a result of an accident, shouldn't they be allowed to collect from the tortfeasor to*

get their money back. That's the way I think it ought to really be.

*Van Waters,* 840 P.2d at 1078 (quoting *Hearing, supra* note 1) (emphasis added). Read as a whole, Senator Meiklejohn's comment did not express concern that a tortfeasor could unfairly incur less liability because a plaintiff carried insurance, but simply sought to ensure that tortfeasors, and not plaintiffs or their insurers, bear the actual cost of the plaintiffs' injuries.

The majority fails to acknowledge that Senator Meiklejohn's goal is met by the subrogation clauses included in most insurance policies, including Tucker's, entitling insurers to recover the cost of treatment from insureds injured by tortfeasors.[2] Under the subrogation framework, an insurer pays for the plaintiff's medical treatment, the plaintiff collects the insurer's actual cost for the treatment from the tortfeasor under the contract exception of section 13–21–111.6, and the plaintiff reimburses the insurer for the actual cost of the treatment.[3] In the end, the tortfeasor, and not the plaintiff or his insurer, bears the cost of the plaintiff's injuries, and no double recovery is necessary.

Although the majority claims it would be unfair for a tortfeasor to benefit from a plaintiff's purchase of insurance, maj. op. at 1087–88, the majority's insistence that a tortfeasor pay a plaintiff damages that neither the plaintiff nor his insurer ever actually incurred in treating the plaintiff's injuries arguably leads to a worse result. In light of the legislature's consideration of these countervailing concerns, this Court should defer to the legislature's overriding purpose in enacting section 13–21–111.6: to avoid double recoveries. *See Van Waters,* 840 P.2d at 1078.

---

**2.** The legislature recently clarified that an insurer cannot seek reimbursement from an insured under a subrogation clause until the insured is fully compensated out of the judgment for the tortfeasor's damages. *See generally* § 10–1–135, C.R.S. (2010). While section 10–1–135 prioritizes the interests of an insured over that of her insurer when collecting on a judgment from a tortfeasor, it does not affect the principle that a subrogated insured must reimburse the insurer for any doubly recovered treatment costs.

**3.** Insureds cannot reasonably assume that they will both recover the cost of their treatment from

## VI. Conclusion

For the foregoing reasons, I believe that the majority's holding is not in accord with the legislature's intent in enacting section 13–21–111.6, the plain text of the statute, or sound public policy. The difference between the amount billed by healthcare providers for a tort plaintiff's treatment and the amount actually paid by the plaintiff's insurer does not qualify for the contract exception and therefore should be set off from the plaintiff's award. Therefore, I dissent.

I am authorized to state that Justice COATS and Justice EID join in this dissent.

the tortfeasor *and* be indemnified against liability for the treatment by their insurers. *See Van Waters,* 840 P.2d at 1081 (Rovira, C.J., specially concurring) (reasoning that "there properly may be a line drawn between insurance, for which there is subrogation or refund of benefits provisions, and benefits represented by . . . disability pensions, for which there is no subrogation" and concluding that only the absence of subrogation renders it "proper to permit plaintiffs to benefit from their own prudence, rather than tortfeasors").