Opinions of the Colorado Supreme Court are available to the
public and can be accessed through the Judicial Branch's homepage at
http://www.courts.state.co.us. Opinions are also posted on the
Colorado Bar Association's homepage at http://www.cobar.org.

ADVANCE SHEET HEADNOTE
November 7, 2016

**2016 CO 72**

**No. 14SC494, <u>Calderon v. American Family Mutual Insurance Company</u> — Statutory Construction — Automobile Insurance Coverage — Automobile Insurance Setoffs — Uninsured or Underinsured Motorist Policy Coverage.**

Arnold Calderon sustained injuries caused by an uninsured driver. Calderon was insured under policies issued by American Family Mutual Insurance Company, which paid the $5,000 policy limit of Calderon's medical payments ("MedPay") coverage but disputed the amount due under the uninsured/underinsured motorist ("UM/UIM") coverage. Calderon filed suit, and the jury returned a verdict of $68,338.97 in his favor. The trial court reduced the award, pursuant to a provision of the policy agreement, by the $5,000 that had already been paid under MedPay coverage. The court of appeals affirmed, interpreting the language of section 10-4-609(1)(c), C.R.S. (2016), which prohibits setoffs from "[t]he amount of the [UM/UIM] coverage available pursuant to this section," as barring only those setoffs that would reduce the coverage limit, or $300,000.

The supreme court reverses, and holds that "[t]he amount of the [UM/UIM] coverage available pursuant to this section" refers to the amount of UM/UIM coverage available on a particular claim (here, $68,338.97), rather than the amount available in the

abstract (here, $300,000). Therefore, section 10-4-609(1) barred the setoff of MedPay payments from Calderon's UM/UIM claim.

## The Supreme Court of the State of Colorado

2 East 14th Avenue • Denver, Colorado 80203

## 2016 CO 72

### Supreme Court Case No. 14SC494
*Certiorari to the Colorado Court of Appeals*
Court of Appeals Case No. 13CA1185

### Petitioner:

Arnold A. Calderon,

v.

### Respondent:

American Family Mutual Insurance Company.

### Judgment Reversed
*en banc*
November 7, 2016

**Attorneys for Petitioner:**
Franklin D. Azar & Associates, P.C.
Robert O. Fischel
Tonya L. Melnichenko
Keith R. Scranton
  *Aurora, Colorado*

Levin Rosenberg PC
Bradley A. Levin
Nelson A. Waneka
  *Denver, Colorado*

**Attorneys for Respondent:**
Sutton Booker, P.C.
Debra K. Sutton
Jacquelyn S. Booker
Katie B. Johnson
  *Denver, Colorado*

**Attorneys for Amicus Curiae Colorado Defense Lawyers Association:**
White and Steele, PC
Joel N. Varnell
  *Denver, Colorado*

**Attorneys for Amicus Curiae Colorado Trial Lawyers Association:**
Ogborn Mihm, LLP
Thomas Neville
  *Denver, Colorado*

**JUSTICE EID** delivered the Opinion of the Court.
**JUSTICE GABRIEL** dissents, and **JUSTICE MÁRQUEZ** and **JUSTICE HOOD** join in the dissent.

¶1 Petitioner Arnold Calderon sustained injuries in a motor vehicle accident with an uninsured motorist. At the time of the accident, Calderon was insured under policies issued by respondent American Family Mutual Insurance Company ("American Family") providing a total of $300,000 in uninsured/underinsured motorist ("UM/UIM") coverage and $5,000 in medical payments ("MedPay") coverage. Following the accident, American Family paid the $5,000 MedPay policy limits directly to Calderon's medical providers. Calderon also made a claim for UM/UIM benefits, but American Family disputed the extent of his damages. Calderon sued for breach of contract, and the jury returned an award of $68,338.97 in his favor. However, the trial court reduced the jury award by $5,000 to set off the MedPay benefits Calderon had already received.

¶2 Calderon appealed the order reducing his judgment, and the court of appeals affirmed, Calderon v. Am. Family Mut. Ins. Co., 2014 COA 70, ¶ 3, __ P.3d __, holding that the setoff of MedPay coverage was not barred by the UM/UIM setoff prohibition, which provides: "The amount of the [UM/UIM] coverage available pursuant to this section shall not be reduced by a setoff from any other coverage, including, but not limited to, . . . [MedPay] coverage . . . ." § 10-4-609(1)(c), C.R.S. (2016). The court interpreted "[t]he amount of the [UM/UIM] coverage available" as referring to the amount available under the policy in the abstract—that is, the UM/UIM coverage limit. See Calderon, ¶ 2. Under such an interpretation, an insurer may reduce the payment due under the insured's UM/UIM coverage by amounts paid pursuant to the insured's

MedPay coverage as long as the UM/UIM coverage limit (here $300,000) is not reduced. Id. at ¶¶ 2–3.

¶3    We granted certiorari and now reverse.[1]    We hold that "[t]he amount of the [UM/UIM] coverage available pursuant to this section" refers not to the coverage limit but rather to the amount of UM/UIM coverage available on a particular claim (here, $68,338.97).    Accordingly, we reverse the court of appeals and remand the case for further proceedings consistent with this opinion.

## I.

¶4    The material facts in this case are not in dispute.    On August 22, 2010, an uninsured driver ran a stop sign and collided with a vehicle driven by Calderon. Calderon sustained injuries that left him unable to work for over a month.    At the time of the accident, Calderon was insured under American Family policies providing $300,000 in UM/UIM coverage and $5,000 in MedPay coverage, for which Calderon paid separate premiums.    The UM/UIM policy endorsement provided in part that

> No one will be entitled to receive duplicate payments for the same elements of loss.    Any amount we pay under this Part to or for an insured person will be reduced by any payment made to that person under any other Part of this policy.    In no event shall a coverage limit be reduced below any amount required by law.

---

[1] We granted certiorari to review the following issues:

1. Whether the statutory structure governing automobile insurance permits an insurer to reduce its payment to an insured for an Uninsured/Underinsured ("UM/UIM") claim by the payments it already made to the insured under the insured's Medical Payments ("MedPay") coverage.
2. Whether the collateral source rule prohibits a setoff of the amount of the coverage available under UM/UIM coverage by MedPay coverage.

Following the accident, Calderon made claims for MedPay and UM/UIM benefits. American Family paid the $5,000 policy limits of Calderon's MedPay coverage to his medical providers, but disputed the amount due under Calderon's UM/UIM coverage.

¶5   Calderon filed suit asserting breach of contract, common law bad faith, and statutory bad faith under sections 10-3-1115 and -1116, C.R.S. (2016).  The trial court bifurcated the contract claim from the issue of bad faith, and the contract claim was tried to a jury on December 17 and 18, 2012.  The jury returned a verdict of $68,338.97 in Calderon's favor, including $34,394.65 for past medical expenses.  The trial court reduced the award by the $5,000 American Family had previously paid under Calderon's MedPay coverage, and entered judgment against American Family for $77,459, which included prejudgment interest.  American Family paid the judgment. The trial court then entered summary judgment for American Family on Calderon's bad faith claims.

¶6   Calderon appealed the order reducing his judgment, and the court of appeals affirmed.  Calderon, ¶ 3.  The court interpreted the language of the setoff prohibition barring a reduction of "[t]he amount of the [UM/UIM] coverage available" as referring to the amount available under the policy in the abstract—that is, the UM/UIM coverage limit.  See id. at ¶ 2.  The court reasoned that, because an insurer may reduce the payment due under the insured's UM/UIM coverage by amounts paid pursuant to the insured's MedPay coverage as long as the UM/UIM coverage limit (here, $300,000) is not reduced, the setoff here was permissible.  Id. at ¶¶ 2–3.  According to the court, Calderon's argument to the contrary "incorrectly equate[d] the term 'coverage' with the

5

term 'benefit,'" and improperly permitted "double recovery." Id. at ¶¶ 12, 16–18, 25–26. We granted certiorari and now reverse.

**II.**

¶7     Calderon argues that the setoff of the $5,000 in MedPay coverage in this case is contrary to section 10-4-609(1)(c), C.R.S. (2016), which, as amended in 2007, provides: "The amount of the [UM/UIM] coverage available pursuant to this section shall not be reduced by a setoff from any other coverage, including, but not limited to, legal liability insurance, medical payments coverage, health insurance, or other uninsured or underinsured motor vehicle insurance." We agree that the setoff prohibition of section 10-4-609(1)(c) bars the setoff of MedPay coverage in this case, and accordingly reverse the court of appeals.

¶8     Echoing the court of appeals, American Family argues that the setoff prohibition bars only those setoffs that would reduce the coverage limit of a particular policy. It reads the first portion of the statutory language—namely, "The amount of the [UM/UIM] coverage available pursuant to this section"—as referring to the amount of coverage available in a particular policy in the abstract, or the coverage limit (here, $300,000). By contrast, Calderon reads the same statutory language as referring to the amount of coverage available under a particular claim (here, $68,338.97).

¶9     The question, then, is whether the "amount of the [UM/UIM] coverage available pursuant to this section" refers to the amount available under the policy in the abstract, or in a particular case. When read in isolation, the phrase might be read either way. However, we adopt the latter construction because it makes sense of the entirety of the

6

provision at issue here. See In re Marriage of Ikeler, 161 P.3d 663, 666–67 (Colo. 2007) ("[A] statute must be read and considered as a whole.").

¶10 The second phrase of the prohibition provides that the amount of UM/UIM coverage available "shall not be reduced by a setoff from any other coverage, including, but not limited to, . . . medical payments coverage." § 10-4-609(1)(c) (emphasis added). This portion of the provision refers to a setoff of the amount actually paid pursuant to a particular coverage, not simply the coverage limit. This is true because a "setoff from any other coverage" is a particular amount paid pursuant to that coverage. See Setoff, Black's Law Dictionary (10th ed. 2014) (defining "setoff" as the "right to reduce the amount of a debt by any sum the creditor owes the debtor"). The language covers all setoffs, not just those where coverage limits have been reached. Indeed, it would make little sense to prohibit a setoff only for the coverage limit of other types of insurance that the claimant might hold—for example, "legal liability insurance, . . . health insurance, or other uninsured or underinsured motor vehicle insurance," § 10-4-609(1)(c)—because the coverage limit of those insurance policies would not generally be known, just the amount paid pursuant to the coverage. In sum, reading the first phrase in light of the second, we conclude that section 10-4-609(1)(c) bars the setoff of MedPay payments from the amount actually paid pursuant to UM/UIM coverage.

¶11 This construction is consistent with our observation that UM/UIM insurance is designed to put "an injured party having uninsured motorist coverage in the same position as if the uninsured motorist had been insured." Barnett v. Am. Family Mut. Ins. Co., 843 P.2d 1302, 1308 (Colo. 1993) (quoting Kral v. Am. Hardware Mut. Ins. Co.,

7

784 P.2d 759, 764 (Colo. 1989)); see also USAA v. Parker, 200 P.3d 350, 358–59 (Colo. 2009) (same); § 42-7-102, C.R.S. (2016) (under UM/UIM coverage, "insurance benefits have been paid for by either the negligent driver or the innocent victim for the purpose of compensating the innocent victim for injuries or losses"). Here, no one disputes that had Calderon been injured in an accident caused by an insured driver, he would have received benefits from American Family pursuant to his MedPay coverage, as well as medical expenses from the other driver's insurance company. In other words, under the construction advocated by American Family, Calderon would receive $5,000 less in compensation because he was injured by an uninsured or underinsured driver. We see no indication from the language of the setoff prohibition that the legislature intended such disparate treatment.

¶12    The court of appeals rejected the construction we adopt today for two reasons, neither of which we find persuasive. First, it concluded that such a construction confused the term "coverage" with the term "benefit." Calderon, ¶¶ 16–18. We agree with the court of appeals that there is a distinction between the two terms—coverage refers to the type of insurance, and benefit refers to the amount paid out pursuant to that coverage, id.—but disagree that the construction we adopt today confuses the two terms. The setoff prohibition does not use the term "coverage" in isolation. Rather, it refers to "[t]he amount of the [UM/UIM] coverage available pursuant to this section" and the fact that such amount cannot be reduced "by a setoff from any other coverage." § 10-4-609(1)(c). Under the construction we adopt today, both uses of the term "coverage" refer to the type of insurance. As noted above, the question is whether the

8

reference point for the "amount . . . available" and "setoff from" that type of insurance is in the abstract or in a particular case. We believe it is the latter.

¶13 The court of appeals also expressed concern about preventing double recovery. Calderon, ¶¶ 12, 25–26. But there is no double recovery problem here. Rather, as this court has recognized, benefits received under separate coverages can substantially overlap without constituting a double recovery. For example, in Newton, we observed that while personal injury protection ("PIP") and UM/UIM coverage substantially overlapped—the former covered medical expenses, rehabilitation and occupational training costs, lost wages, and, to a certain extent, loss of essential services, and the latter covered any loss stemming from bodily injury or death up to policy limits—the coverage was not duplicative. Newton v. Nationwide Mut. Fire Ins. Co., 594 P.2d 1042, 1043–44 (Colo. 1979) (holding that a setoff of PIP benefits from UM/UIM coverage violated public policy). Similarly, in Barnett, we concluded that Social Security Disability Insurance ("SSDI") benefits and UM/UIM benefits overlap but are not duplicative, as the former is designed to compensate for a loss of income, whereas the latter, again, covers any loss. 843 P.2d at 1309 (holding that a setoff for SSDI benefits from UM/UIM coverage violated public policy). We affirmed the holding of Newton that "an overlap of benefits is distinguishable from double recovery." Id. at 1308 (citing Newton, 594 P.2d at 1043–44).

¶14 Like the PIP benefits at issue in Newton and the SSDI benefits at issue in Barnett, Calderon's MedPay and UM/UIM benefits overlap but are not duplicative. MedPay coverage pays for reasonable medical expenses regardless of fault. § 10-4-636(4)(a),

9

C.R.S. (2016). UM/UIM coverage, in contrast, compensates an insured for "loss resulting from liability imposed by law for bodily injury or death suffered by any person arising out of the ownership, maintenance, or use of a motor vehicle." § 10-4-609(1)(a). Calderon's MedPay coverage thus provided something his UM/UIM coverage did not—namely, the quick reimbursement of medical expenses even where he was at fault. It therefore provides overlapping, but not duplicative, coverage.

¶15 Moreover, while double recovery is disfavored, so is payment of duplicative premiums. Like the insured in Newton, 594 P.2d at 1043, Calderon paid separate premiums for the two types of coverage at issue here. As this court observed in Newton, "[i]t is unlikely that the legislature intended that motorists pay twice for what would be in essence a single coverage [were a setoff permitted]. While duplicating benefits is not favored, neither is duplicating premiums." Id. at 1045 n.8. Indeed, in Barnett, this court expressed concern that the insurer stood to receive a windfall by collecting two premiums for one coverage. 843 P.2d at 1307 ("Allowing American Family to receive such a windfall at the expense of Barnett undermines the purpose of UM/UIM coverage."). Permitting an insured who purchased both UM/UIM and MedPay coverage to recover benefits equal to those obtainable for injury caused by an adequately insured motorist simply guarantees that insureds like Calderon get what they paid for.

¶16 To the extent that Calderon's insurance purports to allow the setoff in this case, it is contrary to the setoff prohibition of section 10-4-609(1)(c) and is unenforceable. See State Farm Mut. Auto. Ins. Co. v. Kastner, 77 P.3d 1256, 1260 (Colo. 2003) (citing

10

Peterman v. State Farm Mut. Auto. Ins. Co., 961 P.2d 487, 492 (Colo. 1998)) ("Should the contract fail to conform to any statute, it is unenforceable to that extent.").  Because we hold that the setoff prohibition of section 10-4-609(1)(c) bars the setoff of Calderon's MedPay coverage, we do not address Calderon's alternative arguments against the setoff.

### III.

¶17    We hold that the setoff of MedPay benefits in this case is barred by the setoff prohibition of section 10-4-609(1)(c).  We therefore reverse and remand the case for further proceedings consistent with this opinion.

**JUSTICE GABRIEL** dissents, and **JUSTICE MÁRQUEZ** and **JUSTICE HOOD** join in the dissent.

JUSTICE GABRIEL, dissenting.

¶18 The majority concludes that section 10-4-609(1)(c), C.R.S. (2016), prohibited American Family from setting off from the amount due Calderon pursuant to his uninsured or underinsured motorist ("UM/UIM") coverage the amount that American Family had previously paid pursuant to Calderon's medical payments ("MedPay") coverage. See maj. op. ¶¶ 7, 17. In my view, however, the statutory scheme governing automobile insurance permits such a setoff when, as here, a setoff is necessary to avoid a double recovery at the insurer's expense.

¶19 Accordingly, I respectfully dissent.

## I. Facts

¶20 I agree with the majority that the material facts of this case are not in dispute, id. at ¶ 4, and I need not repeat the majority's factual recitation here. I do, however, note several facts that are essential to an understanding of my analysis.

¶21 The UM/UIM endorsement of Calderon's policy provided that American Family would "pay compensatory damages for bodily injury which an insured person is legally entitled to recover from the owner or operator of an uninsured motor vehicle or an underinsured motor vehicle." Under the heading "LIMITS OF LIABILITY," this endorsement further provided:

> No one will be entitled to receive duplicate payments for the same elements of loss. Any amount we pay under this Part to or for an insured person will be reduced by any payment made to that person under any other Part of this policy. In no event shall a coverage limit be reduced below any amount required by law.

1

¶22 Pursuant to the MedPay endorsement of Calderon's policy, American Family agreed to "pay to or on behalf of an insured person usual and customary medical expenses and funeral services because of bodily injury sustained to an insured person as a result of an accident." This endorsement also contained a "LIMITS OF LIABILITY" clause. That clause provided, "Any amount we pay under this coverage to or for an injured person applies against any other coverage applicable to the loss so that there is not a duplication of payment. In no event shall a coverage limit be reduced below any amount required by law."

¶23 Pursuant to this MedPay endorsement, American Family immediately paid the $5,000 limits of Calderon's MedPay coverage to his medical providers, to reimburse them for medical services provided to Calderon.

## II. Analysis

¶24 As noted above, Calderon's insurance contract expressly proscribed "duplicate payments for the same elements of loss." Even if a policy provision is unambiguous, however, it is "void and unenforceable if it violates public policy by attempting to 'dilute, condition, or limit statutorily mandated coverage.'" Aetna Cas. & Sur. Co. v. McMichael, 906 P.2d 92, 100 (Colo. 1995) (quoting Meyer v. State Farm Mut. Auto. Ins. Co., 689 P.2d 585, 589 (Colo. 1984)); see also DeHerrera v. Sentry Ins. Co., 30 P.3d 167, 173 (Colo. 2001) ("An insurance contract that denies statutorily mandated coverage is void and unenforceable."); Huizar v. Allstate Ins. Co., 952 P.2d 342, 344 (Colo. 1998) (explaining that a term in an insurance contract is void if it "undermine[s] legislatively-expressed public policy").

2

¶25 Accordingly, I begin by addressing the statutory scheme governing automobile insurance, and, in particular, the provisions applicable to UM/UIM and MedPay coverage, to determine whether the setoff at issue violates legislatively expressed public policy. I then turn to Calderon's alternative argument (which the majority did not reach), namely, the applicability of the post-verdict setoff component of the collateral source rule, codified at section 13-21-111.6, C.R.S. (2016). See Sunahara v. State Farm Mut. Auto. Ins. Co., 2012 CO 30M, ¶ 13, 280 P.3d 649, 654 (noting that Colorado's collateral source rule consists of, among other things, a post-verdict setoff rule that is codified at section 13-21-111.6).

## A. Statutes Governing Automobile Insurance Policies

¶26 In 1965, the General Assembly enacted the Motor Vehicle Financial Responsibility Act, declaring that "it is the policy of this state to induce and encourage all motorists to provide for their financial responsibility for the protection of others, and to assure the widespread availability to the insuring public of insurance protection against financial loss caused by negligent financially irresponsible motorists." Ch. 91, sec. 1, § 13-7-60, 1965 Colo. Sess. Laws 333. In furtherance of this policy, Colorado law now requires insurers to offer UM/UIM coverage, § 10-4-609(1), (4), C.R.S. (2016), as well as MedPay coverage, see § 10-4-635(1)(a), C.R.S. (2016), to purchasers of liability insurance. Calderon purchased both coverages.

## 1. UM/UIM Coverage

¶27 The majority concludes that section 10-4-609, which governs the UM/UIM coverage that Calderon purchased from American Family, prohibits the $5,000 setoff.

See maj. op. ¶¶ 7, 17. In my view, however, this interpretation contravenes both the express language of the statute and the public policies that this court has described in cases construing previous versions of the statute.

### a. Section 10-4-609

¶28 Section 10-4-609(1)(a) requires insurers to offer UM/UIM coverage, in addition to liability coverage, to cover the difference, if any, "between the amount of the limits of any legal liability coverage and the amount of the damages sustained, . . . up to the maximum amount of the coverage obtained pursuant to this section." Section 10-4-609(1)(c), in turn, provides, "The amount of the coverage available pursuant to this section shall not be reduced by a setoff from any other coverage, including, but not limited to, legal liability insurance, medical payments coverage, health insurance, or other uninsured or underinsured motor vehicle insurance."

¶29 The majority concludes that the above-quoted language, which was added in 2007, see ch. 413, sec. 1, § 10-4-609(1)(c), 2007 Colo. Sess. Laws 1921, prevents insurers from ever subtracting MedPay benefits from their UM/UIM liability. See maj. op. ¶¶ 7, 17. I respectfully disagree.

¶30 Section 10-4-609(1)(c) prohibits any reduction in the "amount of coverage available" to the insured; it does not, however, prohibit a reduction in the benefits paid to an insured who otherwise has been fully compensated, for the purpose of avoiding double recovery. Cf. Levy v. Am. Family Mut. Ins. Co., 293 P.3d 40, 48 (Colo. App. 2011) ("Where a double recovery is involved, by definition, an insured is not deprived of any benefit of coverage."). As the division in this case reasoned, the difference lies in

4

the distinction between "coverage" and "benefits" in the insurance context. See Calderon v. Am. Family Mut. Ins. Co., 2014 COA 70, ¶ 16, __ P.3d __.

¶31    Insurance is "a contract whereby one, for consideration, undertakes to indemnify another or to pay a specified or ascertainable amount or benefit upon determinable risk contingencies." § 10-1-102(12), C.R.S. (2016). Under this framework, "benefit" refers to the amount actually paid pursuant to the contract. See Benefit, Webster's Third New Int'l Dictionary (2002) (defining "benefit," in pertinent part, as "a cash payment or service provided for under an annuity, pension plan, or insurance policy"). "Coverage," in contrast, refers to the maximum covered risk for which the insurer may be liable in the event that such a risk is realized. See Coverage, Black's Law Dictionary (10th ed. 2014) (defining "coverage" as "the risks within the scope of an insurance policy"); see also § 10-4-601(10), C.R.S. (2016) (describing the types of "coverage" that may be included in an automobile insurance policy, including collision, bodily injury liability, and property damage liability); § 10-4-620, C.R.S. (2016) (requiring, at a minimum, legal liability coverage for bodily injury or death arising out of the use of a motor vehicle in the amounts of $25,000 per person and $50,000 per accident).

¶32    In this case, Calderon's insurance policy guaranteed him the payment of up to $300,000 in benefits to compensate him for damages due to bodily injury (pursuant to the UM/UIM endorsement of his contract) and up to $5,000 for medical expenses (pursuant to the MedPay endorsement of his contract). Moreover, Calderon's MedPay coverage allowed him to obtain "speedy reimbursement for medical expenses incurred as a result of an automobile collision without regard to the insured's fault."

DeHerrera v. Am. Family Mut. Ins. Co., 219 P.3d 346, 351 (Colo. App. 2009). The jury ultimately determined that due to the collision, American Family owed Calderon benefits in the amount of $68,338.97, reflecting the total sum of his damages, including medical expenses. Under different circumstances, however, American Family could have been liable to Calderon for up to $305,000, the total amount of coverage available under the policy. Section 10-4-609(1)(c) prohibits a setoff that would reduce the amount of coverage available to an insured; it does not, however, prohibit a setoff from the benefits paid in order to avoid a double recovery, which is the type of setoff at issue in this case.

¶33    A contrasting example illustrates the distinction between benefits and coverage in this context. Had Calderon's damages exceeded the limits of his UM/UIM coverage (i.e., $300,000), American Family could not have reduced its liability below those limits by offsetting amounts that it had paid Calderon pursuant to his MedPay coverage. For example, if a plaintiff with Calderon's policy suffered $310,000 in damages, then he or she could collect $300,000 in UM/UIM benefits plus $5,000 in MedPay benefits from American Family, for a total of $305,000. A setoff in these circumstances would amount to a reduction in the "amount of coverage available" to compensate an insured and would violate both section 10-4-609(1)(c) and the terms of Calderon's policy, which provided that "[i]n no event shall a coverage limit be reduced below any amount required by law."

¶34    For these reasons, I am not persuaded by the majority's conclusion that the "setoff" prohibition in section 10-4-609(1)(c) refers to the amount actually paid pursuant

to a particular coverage, and not to the coverage limit. See maj. op. ¶ 10. Although the majority acknowledges that "benefits" and "coverage" are distinct concepts, see id. at ¶ 12, its analysis nonetheless appears to conflate the two.

¶35 Accordingly, in my view, the plain language of section 10-4-609 does not prevent American Family from taking a setoff in this case, and I proceed to consider whether public policy precludes such a setoff, as Calderon contends.

### b. Public Policy

¶36 In a trilogy of cases concerning an earlier version of section 10-4-609, this court limited insurers' ability to take setoffs against their UM/UIM liability. Calderon argues that the public policies discussed in those cases prohibit offsetting the MedPay benefits that he received from American Family's UM/UIM liability. I disagree.

¶37 In the first case of the trilogy, Newton v. Nationwide Mutual Fire Insurance Co., 594 P.2d 1042 (Colo. 1979), this court invalidated a setoff clause that would have allowed the insurer to reduce the amount payable under its UM policy by any amount of personal injury protection ("PIP") benefits paid as a result of the same collision. We noted that PIP coverage and UM coverage provide benefits that "overlap to some extent but are not duplicative." Id. at 1043. Specifically, UM benefits compensate an insured for "losses incurred above the PIP limits for medical expenses, lost wages and lost essential services, plus general damages different in kind from those compensable under the PIP provisions, such as pain and suffering." Id. at 1044. As a result, allowing the insurer to reduce the amount payable under its UM policy by the amount of PIP benefits paid effectively would have allowed the insurer to provide less than the

7

statutorily required minimum UM coverage.  Id. at 1043.  We concluded that such a result was "contrary to the legislative intent to encourage purchase of stated minimum coverages of uninsured motorist insurance" and that therefore, the setoff clause at issue was invalid and unenforceable.  See id.

¶38    Ten years later, in Kral v. American Hardware Mutual Insurance Co., 784 P.2d 759, 760–61 (Colo. 1989), an insured party challenged the enforceability of (1) a subrogation clause that required the insured to reimburse the insurer in the event that the insured recovered funds from "another party" and (2) a release-trust agreement in which the insured agreed to hold fifteen percent of any monies received in her tort action in trust for the insurer.  This court agreed with the insured's argument that agreements limiting insurers' liability for UM benefits were enforceable "only to the extent such reduction in benefits would not impair the ability of the insured to achieve full compensation for any loss caused by the conduct of an uninsured motorist."  Id. at 763.  In addition, we discerned a "clear legislative purpose to place an injured party having uninsured motorist coverage in the same position as if the uninsured motorist had been insured."  Id. at 764.

¶39    Turning then to the facts presented, we concluded that enforcement of the agreements at issue would have put the insured in the same position as if she had not purchased UM coverage at all, and we opined that such a result would have contravened public policy.  Id.  We further concluded, however, that the insurer could enforce the release-trust agreement in part, namely, to the extent necessary to prevent the insured from "receiving sums in excess of her total loss."  Id.  In so holding, we

8

stated that "the General Assembly did not intend to grant windfall profits to insureds by authorizing them to obtain double recovery for the same loss." Id. at 766.

¶40 Finally, in Barnett v. American Family Mutual Insurance Co., 843 P.2d 1302, 1307–08 (Colo. 1993), this court concluded that insurers could not "absolve their liability under UM/UIM provisions by reducing the amount of UM/UIM coverage they contracted to provide by payments received for separate and distinct insurance benefits," such as Social Security Disability Insurance (SSDI) benefits. In light of this conclusion, we rejected the insurer's argument that precluding a setoff of the SSDI benefits from the UM/UIM benefits would result in an improper double recovery for the insured. Id. at 1309. In so ruling, we observed, "The SSDI benefits are designed to compensate the insured for a loss of income resulting from a disability, while UM/UIM coverage compensates the insured for '[a]ny loss arising from bodily injury or death up to the policy limits.'" Id. at 1309 (quoting Newton, 594 P.2d at 1044). Like the PIP benefits at issue in Newton, we viewed SSDI benefits as overlapping with, but not duplicative of, UM/UIM benefits. Id. Accordingly, we concluded that allowing the insurer to subtract SSDI benefits from its UM/UIM liability "would contravene the public policies of providing full recovery within policy limits[] and placing 'an injured party having uninsured motorist coverage in the same position as if the uninsured motorist had been insured.'" Id. at 1308 (quoting Kral, 784 P.2d at 764).

¶41 In my view, all three of these cases required this court to balance two sometimes-competing objectives: the avoidance of double recovery by an insured and the full protection of coverage for which insureds have paid premiums. In the instant

case, the setoff at issue furthers both of these objectives. Specifically, it prevents Calderon from recovering twice (and avoids American Family's having to pay twice) for the same loss, namely, $5,000 in medical bills. In addition, the setoff provides Calderon with the benefits of his UM/UIM coverage "to the extent necessary for full compensation for loss caused by the negligent conduct of a financially irresponsible motorist." Kral, 784 P.2d at 764.

¶42 Moreover, the setoff in this case is fully consistent with the coverages for which Calderon paid premiums. Specifically, as stated above, Calderon's UM/UIM and MedPay policies provided, in turn, that (1) any amounts paid by American Family pursuant to the UM/UIM provision would be reduced by any payment made under any other part of Calderon's policy and (2) any amount paid under the MedPay provision applied against any other applicable coverage so that no duplicate payment would result. In other words, Calderon received precisely what his policies promised he would receive, and unlike the majority, I perceive no basis for concluding that the foregoing policy provisions are unenforceable. See maj. op. ¶ 16. To the contrary, for the reasons noted above, the policy provisions at issue are consistent with the statutory scheme, and, indeed, they track the guidance for avoiding duplicative recovery that this court provided in Newton almost forty years ago. See Newton, 594 P.2d at 1046 (noting that (1) the proper method for avoiding a double recovery of PIP-type losses under both PIP and UIM coverages is "to eliminate PIP paid benefits from the uninsured motorist Claim, then allow recovery of the uninsured motorist benefits to the extent non-PIP benefits are proved, up to the policy limits," and (2) such a procedure "would preclude

10

actual double recovery of no-fault benefits while allowing the insured the full protection of the uninsured motorist coverage for which he paid a premium").

¶43    In my view, the setoff provision in Calderon's insurance policy parallels the provision at issue in <u>Newton</u> and thus was a proper method to avoid the double recovery of MedPay-type losses in cases like that at issue here.

¶44    I am not persuaded otherwise by the majority's assertion that "there is no double recovery problem here."   Maj. op. ¶ 13.   It is undisputed that American Family immediately paid $5,000 to Calderon's medical providers, thereby exhausting his MedPay coverage.  Absent a setoff, American Family will pay the same $5,000—and Calderon will recover the same $5,000—a second time, namely, under the UM/UIM coverage, resulting in Calderon's recovery of $5,000 more than the actual damages that he proved at trial.  In my view, such a windfall is not attributable to an "overlap" in coverage, as the majority suggests.  <u>See</u> <u>id.</u>  Rather, it is attributable to an improper duplicative payment.

¶45    Nor am I convinced by the majority's conclusion that allowing the setoff contravenes the principle that UM/UIM insurance should place an injured party having such insurance in the same position as if the uninsured or underinsured motorist had been fully insured.  <u>See</u> <u>id.</u> at ¶ 11.  Calderon asserts that if the driver who caused the collision had carried enough liability insurance, then Calderon would have received the full amount of his damages from the tortfeasor's insurer <u>plus</u> $5,000 in MedPay benefits from American Family (thus resulting in a $5,000 windfall to Calderon).   In this hypothetical scenario, however, American Family would have fully compensated

11

Calderon once, as public policy requires. Cf. Kral, 784 P.2d at 764 (explaining the "strong public policy" in favor of enabling an insured who purchases UM protection to receive the benefits of that coverage to the extent necessary for full compensation for losses caused by financially irresponsible motorists). Requiring American Family to pay some of Calderon's medical expenses twice, however, furthers no public policy. See Huizar, 952 P.2d at 348 ("Not every deviation in uninsured motorist coverage from the protection an insured would be provided if the uninsured motorist was insured constitutes an impermissible attempt to dilute uninsured motorist coverage in violation of public policy.").

¶46 Moreover, in the scenario that Calderon posits, in which the tortfeasor carried sufficient liability insurance and the insured obtained MedPay benefits from his or her own insurer, any windfall that the insured might obtain results from a different public policy. Specifically, in that context, public policy precludes the tortfeasor from setting off the MedPay benefits that the insured obtained from his or her own insurer because granting the tortfeasor a setoff in those circumstances would improperly allow the tortfeasor to take advantage of the fact that the insured purchased (and paid a premium for) MedPay coverage. See Restatement (Second) of Torts § 920A cmt. b (Am. Law Inst. 1979) ("[I]t is the position of the law that a benefit that is directed to the injured party should not be shifted so as to become a windfall for the tortfeasor. If the plaintiff was himself responsible for the benefit, as by maintaining his own insurance . . . , the law allows him to keep it for himself."). Thus, in the scenario in which either the tortfeasor or the insured will receive an advantage from the fact that the insured bought MedPay

12

coverage, public policy favors allocating the windfall to the insured. Id. In the present case, in contrast, a setoff prevents either party from receiving a windfall, leaving us no potential windfall to allocate.

¶47 For these reasons, I do not believe that either section 10-4-609 or the public policies underlying that provision preclude the setoff at issue. I thus must proceed to consider Calderon's alternative argument that the statute governing MedPay coverage prohibits such a setoff.

## 2. MedPay Coverage

¶48 Pursuant to section 10-4-635(1)(a), insurers must offer $5,000 of MedPay coverage "for bodily injury, sickness, or disease resulting from the ownership, maintenance, or use of [a] motor vehicle."

¶49 Section 10-4-635(3), C.R.S. (2016), in turn, provides in pertinent part:

(a) An insurer providing benefits under medical payments coverage . . . shall not have a right to recover against an owner, user, or operator of a motor vehicle, or against any person or organization legally responsible for the acts or omissions of such person, in any action for damages for benefits paid under such medical payments coverage. An insurer shall not have a direct cause of action against an alleged tortfeasor for benefits paid under medical payments coverage.

(b) Nothing in this subsection (3) shall be construed to:

. . . .

(II) Prevent a person to whom benefits are paid under medical payments coverage from obtaining recovery of benefits available under uninsured motorist coverage pursuant to section 10-4-609; or

(III) Afford an insurer a cause of action against a person to whom or for whom the medical payments coverage benefits specified in this section were paid except in a case where the benefits were paid by reason of fraud.

13

¶50    According to Calderon, when read together, the foregoing provisions prevent American Family from "claw[ing] back" MedPay benefits by reducing UM/UIM benefits. Again, I am unpersuaded.

¶51    Although section 10-4-635(3) does not use the word "subrogation," it is, on its face, an anti-subrogation provision. "Subrogation is defined as the 'substitution of one person for another; that is, one person is allowed to stand in the shoes of another and assert that person's rights against the defendant.'" Am. Family Mut. Ins. Co. v. DeWitt, 218 P.3d 318, 323 (Colo. 2009) (quoting 1 Dan B. Dobbs, Law of Remedies, § 4.3(4), at 604 (2d ed. 1993)). As pertinent here, section 10-4-635(3)(a) limits an insurer's right to recover "against an owner, user, or operator of a motor vehicle, or against any person or organization legally responsible for the acts or omissions of such person, in any action for damages for benefits paid under [the insured's MedPay] coverage." Moreover, the section expressly prohibits an insurer from bringing "a direct cause of action against an alleged tortfeasor for benefits paid under [MedPay] coverage." Id. Accordingly, section 10-4-635(3)(a) precludes an insurer from bringing either damages or subrogation claims seeking to recover benefits paid under an insured's MedPay coverage.

¶52    Here, American Family is not pursuing either a damages or a subrogation claim against the uninsured driver (or anyone else). Accordingly, section 10-4-635(3) does not apply, and it cannot "be construed to" prohibit the challenged setoff.

¶53    Even if section 10-4-635(3) could apply, however, it would not preclude the setoff at issue because the setoff would not have prevented Calderon "from obtaining recovery of benefits available under uninsured motorist coverage pursuant to section

14

10-4-609." § 10-4-635(3)(b)(II). To the contrary, as explained above, the post-setoff judgment fully compensated Calderon for the damages that he incurred, in accordance with both applicable law and the terms of the UM/UIM endorsement of his insurance policy. Cf. Kral, 784 P.2d at 765 ("[T]he statute requiring insurers to provide uninsured motorist coverage in or supplemental to liability insurance contracts reflects a strong legislative intent to permit insureds who purchase such coverage to receive the benefits thereof to the extent necessary for full compensation for loss caused by the negligent conduct of financially irresponsible motorists.").

¶54    I am not persuaded otherwise by the majority's conclusion, see maj. op. ¶ 15, that by paying separate premiums for MedPay coverage and UM/UIM coverage, Calderon was entitled to recover benefits pursuant to both coverages, irrespective of whether that would lead to recovery in excess of his damages. See Newton, 594 P.2d at 1045 n.8 ("While duplicating benefits is not favored, neither is duplicating premiums.").

¶55    In general, an insured who pays a separate premium to obtain additional coverage deserves the protection of such additional coverage. See Barnett, 843 P.2d at 1308 ("An individual who pays for increased coverage should receive the additional benefits which the insurer agreed to provide."). Such additional protection, however, does not support an insured's obtaining a double recovery on facts like those present here, particularly when Calderon's coverages protected him against different risks.

¶56    Specifically, in this case, Calderon's MedPay coverage allowed him to obtain prompt reimbursement for his medical expenses without regard to fault. DeHerrera, 219 P.3d at 351. Accordingly, when American Family immediately reimbursed

Calderon's medical providers after the collision, without considering who was at fault, Calderon received the benefit of his MedPay coverage, and the post-verdict setoff did not render that benefit illusory. Cf. Levy, 293 P.3d at 46 (opining that allowing the insurer to reduce an arbitration award by the amount it had already paid for the insured's medical payments did not render the insured's MedPay coverage illusory because the benefits of prompt payment of the insured's medical expenses regardless of fault were valuable). Moreover, the UM/UIM endorsement to Calderon's policy, which stated that "[n]o one will be entitled to receive duplicate payments for the same elements of loss," expressly provided for a setoff. Accordingly, Calderon got precisely the coverages for which he paid.

¶57 For the foregoing reasons, I believe that the challenged setoff is consistent both with the statutes governing UM/UIM and MedPay coverages and with the public policies underlying those statutes. I therefore respectfully disagree with the majority's contrary conclusion.

## B. The Collateral Source Rule

¶58 Because I perceive no statutory or public policy prohibition on the setoff at issue, I must proceed to address Calderon's final arguments that (1) the contract exception to the collateral source rule precludes a tortfeasor (here, the uninsured driver) from reducing his or her liability by any insurance benefits that the insured had received and (2) American Family, as Calderon's UM/UIM insurer, effectively stands in the shoes of the uninsured driver and should likewise be precluded from reducing its liability by the MedPay benefits that Calderon had received. I am not persuaded.

16

¶59    At common law, the collateral source rule precluded a tortfeasor from reducing his or her liability by the amount of compensation that the injured party received from a third-party source. Volunteers of Am. Colo. Branch v. Gardenswartz, 242 P.3d 1080, 1083 (Colo. 2010). Under this rule, "making the injured plaintiff whole [was] solely the tortfeasor's responsibility," and any third-party benefits paid to an injured plaintiff were "collateral" and "irrelevant in fixing the amount of the tortfeasor's liability." Id. at 1082–83. Although such a rule could sometimes result in a windfall recovery for the plaintiff, "it was considered more just that the benefit be realized by the plaintiff in the form of double recovery rather than by the tortfeasor in the form of reduced liability." Van Waters & Rogers, Inc. v. Keelan, 840 P.2d 1070, 1074 (Colo. 1992).

¶60    In 1986, the General Assembly modified the common law collateral source rule by enacting section 13-21-111.6 as part of a package of tort reforms. Gardenswartz, 242 P.3d at 1084. The first clause of section 13-21-111.6 partially negated the common law collateral source rule by directing the trial court, following a damages verdict, to adjust the plaintiff's award by deducting the compensation or benefits received from collateral sources (i.e., sources other than the tortfeasor). Id. The second clause, however, established the so-called "contract exception" to the collateral source rule. Id. This exception preserved the common law rule for certain benefits. Id. Specifically, the exception provides that "the verdict shall not be reduced by the amount by which [a plaintiff] . . . has been or will be wholly or partially indemnified or compensated by a benefit paid as a result of a contract entered into and paid for by or on behalf of" the plaintiff. § 13-21-111.6; see also Riss & Co. v. Anderson, 114 P.2d 278, 281 (Colo. 1941)

17

(refusing to subtract from the plaintiff's damages the amount that he had received under a benefit plan because "a tort-feasor may not plead his victim's prudence and foresight to relieve him from the consequences of his own wrong").

¶61 The prototypical example of "a benefit paid as a result of a contract" is the benefit paid pursuant to a private insurance contract. See Van Waters & Rogers, 840 P.2d at 1078 (noting that the exception clause in section 13-21-111.6 "clearly denies the setoff of benefits that result from private insurance contracts for which someone pays monetary premiums"). In these circumstances, any concern regarding a plaintiff's obtaining a double recovery is tempered by the fact that the plaintiff (or someone on his or her behalf) has paid for the benefits received. See id. (noting that section 13-21-111.6 evinces an intent not to deny a plaintiff compensation to which he or she is entitled by virtue of a contract that the plaintiff, or someone on the plaintiff's behalf, entered into and paid for); see also Gardenswartz, 242 P.3d at 1088 ("[I]t is more repugnant to shift the benefits of the plaintiff's insurance contract to the tortfeasor in the form of reduced liability when the tortfeasor paid nothing toward the health insurance benefits."). Thus, the contract exception recognizes that plaintiffs should receive the benefits for which they paid, and defendants should not be permitted to penalize plaintiffs for their foresight in purchasing insurance. See Gardenswartz, 242 P.3d at 1087.

¶62 This reasoning does not apply, however, when the party liable for the damages award and the "collateral source" are the same entity. See Colo. Permanente Med. Grp., P.C. v. Evans, 926 P.2d 1218, 1230–32 (Colo. 1996). In Evans, 926 P.2d at 1220–21, for example, the plaintiff brought a wrongful death action against, among others, two

18

nurses who were employed by the Kaiser Foundation Health Plan ("Kaiser"), which was also the decedent's medical insurer. After judgment was entered against the nurses, the trial court reduced the damages awarded against them by the amount of the past medical expenses that Kaiser had already paid as the decedent's insurer. Id. at 1230. On review, this court concluded that the nurses were entitled to an offset of the damages awarded against them, but only to the extent of the medical expenses for which Kaiser was liable on the nurses' behalf. Id. at 1231. In so holding, we observed that such a result prevented the plaintiff from obtaining a double recovery. See id. at 1232. In addition, we recognized that the collateral source rule does not apply in situations in which a plaintiff's compensation was attributable to the defendant. See id.

¶63 Here, like the insurer in Evans, American Family is both the party liable for the judgment and the "collateral source" pursuant to the insurance contract. Accordingly, for the reasons set forth in Evans, the contract exception to the collateral source rule does not preclude a setoff here.

¶64 I am not persuaded otherwise by Calderon's contention that Evans is distinguishable because there, the insurer employed (and thus was vicariously liable for the negligence of) two of the tortfeasors, see id. at 1222, whereas here, American Family had no relationship with the uninsured driver. Evans did not turn on the relationship between the insurer and the tortfeasors. Rather, it turned on the fact that the party liable for the decedent's medical expenses was also the decedent's insurer. See id. at 1232.

¶65    In this regard, I note that Evans relied on the Tenth Circuit's decision in Quinones v. Pennsylvania General Insurance Co., 804 F.2d 1167 (10th Cir. 1986).  The court in Quinones, 804 F.2d at 1171–72, addressed an issue that was almost identical to that presented in this case, namely, whether an injured plaintiff was entitled to recover from his UM carrier medical expenses that the insurer had already paid under its policy's MedPay provisions.  The court concluded that application of the collateral source rule in those circumstances would be inappropriate.  Id. at 1171.  The court observed that the case before it did not involve a tortfeasor who was seeking to reduce his liability because of the "happenstance" that the plaintiff had the foresight to purchase insurance.  Id.  To the contrary, the insurer was its own "collateral source." Id.  In those circumstances, the court observed that requiring the insurer to pay the plaintiff's medical expenses twice would serve no public policy.  Id.  As the court explained:

> When the tortfeasor is the defendant, and a source sufficiently identifiable with the tortfeasor pays the plaintiff, we are not "excusing" the defendant from liability when we forego the collateral source rule and reduce his liability by the amount he, in essence, has already paid.  The goals underlying the collateral source rule would not be served by its application in that case.  On the contrary, it would have the undesired result of dissuading those identified with the tortfeasor from coming forward and offering the victim compensation.
>
> Similarly, we are not "excusing" [the insurer] from liability when we forego the collateral source rule in this case; it has completely reimbursed [the plaintiff's] past medical expenses.  Just as the rule's goal is not to reimburse plaintiffs twice, though oftentimes that is its effect, its goal is not to charge defendants twice, either.

Id. at 1172.

¶66 I am persuaded by this reasoning and would follow it in this case.

¶67 Accordingly, I would conclude that the contract exception to the collateral source rule does not apply and that the trial court properly offset the jury's verdict by the amount that American Family had already paid pursuant to the MedPay provision of Calderon's insurance contract.

## III. Conclusion

¶68 The applicable statutory law discussed above reflects a careful balance between the public policy favoring full compensation for injured insureds and the equally important policy disfavoring double recovery for those who have been injured. In my view, the majority opinion upsets this careful balance and unnecessarily invalidates standard policy provisions that served to maintain that balance. I fear that in doing so, the majority opinion will only lead to more litigation in what is already a complex and heavily litigated area of law.

¶69 For these reasons, I respectfully dissent.

I am authorized to state that JUSTICE MÁRQUEZ and JUSTICE HOOD join in this dissent.